**E. Dale MANTOOTH and Brenda J. Mantooth, Defendants–Appellants,**

v.

**The FEDERAL LAND BANK OF LOUIS-VILLE and Rushville Production Credit Association, Plaintiffs–Appellees.**

No. 33A01–8608–CV–00208.

Court of Appeals of Indiana, First District.

Oct. 3, 1988.
Rehearing Denied Dec. 8, 1988.

---

John O. Worth, Worth Law Offices, C. Jack Clarkson, Clarkson Law Offices, Rushville, for defendants-appellants.

John E. Bator, Paul D. Ludwig, Cohen & Malad, Indianapolis, William H. Robbins, Rolfes, Garvey, Walker & Robbins, Greensburg, for the Federal Land Bank of Louisville.

Ben Blanton, Terrill D. Albright, Baker & Daniels, Indianapolis, for Production Credit Ass'n. ·

NEAL, Judge.

## STATEMENT OF THE CASE

Defendants and countercomplainants, E. Dale Mantooth and Brenda J. Mantooth (the Mantooths), appeal an adverse judgment rendered in the Henry Circuit Court in litigation concerning the suits on debt and foreclosure of mortgages and security agreements pursued by the Federal Land Bank of Louisville (FLB) and Rushville Production Credit Association (PCA). The Mantooths filed a counterclaim against FLB and a cross-claim against PCA.

We affirm.

## STATEMENT OF THE FACTS

The Mantooths were farmers and husband and wife. They began farming in 1964 and from that year until 1982 they financed their farming operation with PCA under a full proceeds loan arrangement. By that arrangement, PCA advanced loans to pay the farm operating costs, taking notes and security agreements therefor, which the Mantooths repaid with interest and fees by remitting the proceeds of the sale of farm products to PCA. Such arrangement permitted PCA to monitor the operation and protect their security and assured the Mantooths of operating capital without the necessity of maintaining substantial cash reserves. Each year an annual budget was prepared by the joint efforts of the Mantooths and PCA which included an agreed amount remitted to the Mantooths for living expenses as well as for cars, furniture, and other matters not directly connected to the farm operation.

In 1978 the Mantooths decided to expand their farm operation to include a hog confinement complex. Because PCA's lending limits were only seven years and long-term financing was desirable, PCA referred the Mantooths to FLB who loaned them approximately $215,000, taking a real estate mortgage for security. By 1982 the Mantooths' loan balance to PCA had risen to approximately $325,182 which PCA considered excessive. Negotiations were held concerning long-term refinancing and/or liquidation of at least part of the operation. Partial liquidation of the hog operation was accomplished and the entire operation was listed for sale. For a variety of reasons, including declining prices, poor production, and disease, the hog operation did not succeed. Refinancing was done with PCA who secured the same with a second mortgage on the real estate already mortgaged to FLB. By the latter part of 1982 the Mantooths defaulted on their obligations to both PCA and FLB.

On November 19, 1982, FLB filed suit against the Mantooths seeking to recover on its note and foreclose on its mortgage. PCA filed a cross-claim against the Mantooths on its second mortgage as well as on other notes, obligations, and security agreements owed to it by the Mantooths and sought to foreclose on those security agreements. The Mantooths' responsive

pleading to FLB's complaint and PCA's cross-claim contained a number of affirmative defenses. Additionally, they filed a counterclaim against FLB and a cross-claim against PCA seeking monetary damages in the sum of $10,000,000. Allegations common to the affirmative defenses, cross-claim, and the counterclaim were (1) joint venture and partnership between the Mantooths and PCA or FLB; (2) partnership or joint venture between the Mantooths, PCA and FLB; and (3) fraud and constructive fraud. In the affirmative defenses against FLB, the Mantooths additionally alleged waiver, excused payment, and an escrow agreement. In the affirmative defense against PCA they additionally alleged fraud in the inducement, payment, and lack of consideration. In their counterclaim and cross-claim the Mantooths also alleged a breach of fiduciary relationship on the part of both FLB and PCA.

The trial court granted summary judgment, interlocutory in nature, which awarded judgment to FLB on its note for $347,375.91, plus interest and attorney fees, and ordered the foreclosure of the mortgage. A similar interlocutory summary judgment was entered in favor of PCA for $306,603.51, plus interest in the amount of $122,002.43, and its security interests were ordered foreclosed. The affirmative defenses were set for trial, and the trial court specifically reserved final judgment on the complaint and cross-complaint until determination of the affirmative defenses. In essence, the summary judgments determined only the validity of the notes and security, and the amounts due thereon.

The counterclaim, cross-claim, and affirmative defenses were tried before an advisory jury with the Mantooths proceeding first. At the conclusion of the Mantooths evidence, the trial court granted judgment on the evidence for FLB and PCA on all of the Mantooths' affirmative defenses and portions of their counterclaim and cross-claim. The issues submitted to the advisory jury related to the Mantooths' cross-claim against PCA on fraud in the inducement. The advisory jury found damages as follows: (1) mental anguish—$3,032,000; (2) loss from breach of fiduci-ary relationship—$1,356,000; (3) loss of business credit—$756,000; (4) loss on account of fraud—$1,356,000; for total damages in the sum of $6,500,000.

In its lengthy and carefully drafted findings of fact and conclusions of law, the trial court declined to accept the advisory jury's findings, and after making the summary judgment final, entered judgment for FLB on its complaint, PCA on its cross-claim, and denied the Mantooths' recovery on their counterclaim and cross-claim.

Additional relevant facts will be set forth below under the appropriate heading.

## ISSUES

The Mantooths present ten issues on appeal. They claim the court erred in:

I. Denying them a right to a jury trial.

II. Failing to find fraud on the part of PCA and FLB.

III. Failing to find PCA committed constructive fraud, undue influence, or breached a fiduciary duty.

IV. Denying the Mantooths' motion to amend their pleadings to conform to the evidence.

V. Failing to find a joint venture existed between the Mantooths and PCA.

VI. Granting excessive attorney fees.

VII. Failing to find PCA misused funds.

VIII. Granting judgment on the evidence to FLB and in failing to find that FLB and PCA were jointly responsible as sister organizations.

IX. Failing to rule on pending motions.

X. Making clearly erroneous findings of fact and conclusions of law not supported by the evidence.

## DISCUSSION AND DECISION

Prior to discussing the issues we make some observations on the nature of the

case, the findings of the advisory jury, and the burden of proof at trial, as well as the burden of an appellant to demonstrate error on appeal.

■ Ind. Rules of Procedure, Trial Rule 52 provides that in the case of issues tried upon the facts without a jury, or with an advisory jury, the court shall determine the facts and judgment shall be entered thereon pursuant to Ind. Rules of Procedure, Trial Rule 58. A Trial court is not bound by the answers given by an advisory jury. *Greenwood v. Greenwood* (3d Cir.1956) 234 F.2d 276. However, the trial court may adopt its findings. *Id.*

■ In all cases appealed to the court of appeals there exists a presumption that the trial court decided the questions presented correctly, and it is incumbent upon the appellant to rebut this presumption. *State Board of Tax Commissioners v. Oliverius* (1973), 156 Ind.App. 46, 294 N.E.2d 646; 2 I.L.E. *Appeals* § 511 (1957).

This court does not weigh the evidence nor determine the credibility of the witnesses. *Lawrence County Commissioners v. Chorely* (1979), Ind.App., 398 N.E.2d 694. We consider only the evidence most favorable to support the judgment. *Fort Wayne National Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1308. Only when the evidence is without conflict and leads to but one conclusion and the fact finder reaches an opposite conclusion, will this court disturb the decision. *Hoosier Insurance Company, Inc. v. Mangino* (1981), Ind.App., 419 N.E.2d 978, *trans. denied.*

■ The purpose of special findings is to provide the parties and the reviewing court with the theory upon which the judge decided the case in order that the right to review may be effectively preserved. Special findings are binding on the court of appeals and we cannot ignore them. *In re Marriage of Huth* (1982), Ind.App., 437 N.E.2d 1042. When this court reviews a case in which the trial court has rendered findings of fact and conclusions of law, we will not set aside the trial court's judgment unless it is clearly erroneous. *Husted v. Gwin* (1983), Ind.App., 446 N.E.2d 1361.

Stripped of all formality and legalistic phraseology, the Mantooths theorize that because they borrowed money from PCA and FLB, those institutions somehow assumed the responsibility for the success or failure of their enterprise. The Mantooths allege PCA and FLB became fiduciaries, their guardians as it were, charged with the duty of advising them on all aspects of the operation. If PCA or FLB advised incorrectly, failed to advise, or failed to lead the Mantooths safely through the economic mine fields to anticipate crop failure, disease, adverse markets, the recession of the early 1980's, and other dangers to which business enterprises are subject, they must respond in damages. Implication even exists in their argument that had PCA and FLB refused to make the loans, their business failure would never have occurred. Such theories, if embodied into a rule of law, would doubtlessly wreck the credit system, for no lending institution would chance the result of guaranteeing the success of their debtor.

In some instances PCA and FLB gave certain financial advice in good faith and took certain actions which knowledgeable people recognize as customary in the credit business. There is no evidence whatsoever which demonstrates that such advice caused the Mantooths' business failure. The probable cause of their business failure, we surmise, was the extended and top heavy structure of their debt combined with high interest rates which could not withstand the recession of the early 1980's. That recession accounted for a large number of farm failures.

ISSUE I: *Trial by Jury*

The Mantooths filed a responsive pleading on January 18, 1983, which included their counterclaim against FLB and the cross-claim against PCA. On that date they also filed a request for a jury trial on all issues. FLB and PCA filed motions to strike the jury request on September 20, 1983. Because the nature of the proceeding was equitable, these motions were granted on May 22, 1984. Thereafter, on October 29, 1985, the trial court granted an interlocutory summary judgment to FLB

against the Mantooths and granted an interlocutory summary judgment to PCA on its cross-claim. The only issue disposed of by the summary judgments was the authenticity and amount of the notes and security devices. The affirmative defenses remained in the case to be tried. The request for a jury was never renewed, and the case went to trial before the court and an advisory jury on the Mantooths' affirmative defenses, counterclaim, and cross-claim. The Mantooths now argue that the trial court erred in not granting them a trial by jury. We hold that no reversible error was committed.

▇▇▇ In a foreclosure proceeding, a mortgagor is not entitled to a jury trial despite the existence of a legal counterclaim filed by him, because the proceeding is essentially equitable in nature. *Berkemeier v. Rushville National Bank* (1984), Ind.App., 459 N.E.2d 1194; 17 I.L.E. *Jury* § 13 (1959); *see also Santa Claus, Inc. v. Santa Claus of Santa Claus, Inc.* (1940), 217 Ind. 251, 27 N.E.2d 354; *Ross v. Hobson* (1891), 131 Ind. 166, 26 N.E. 775; *George v. Massey Harris Co.* (1941), 109 Ind.App. 305, 34 N.E.2d 956. At the time the court ruled, striking the Mantooths request for a jury trial on all issues, no error was committed as the court's ruling was correct. The equitable issues were never disposed of because the affirmative defenses to the foreclosure actions remained. Even if the equitable issues were entirely disposed of by the summary judgments and the Mantooths were entitled to a jury on the remaining legal issues, it was incumbent upon them to renew the request for a jury trial after the procedural posture of the case had changed to allow such entitlement. They did not renew the request, thus waiving consideration of the issue.

▇▇▇ Additionally, it is the rule in Indiana that where a party would be entitled to a jury but the request is denied, such denial is considered harmless where it is determined that even had a jury trial been held a directed verdict against the requesting party would have been proper. *Midwest Fertilizer v. Ag–Chem Equipment* (1987), Ind. App., 510 N.E.2d 232. We hold here that a directed verdict on the evidence would have been proper and the error was harmless.

We also reject the Mantooths' argument that the rule against permitting a jury in cases sounding in equity should be changed.

ISSUE II: *Fraud of PCA and FLB*

The Mantooths contend that in January of 1982, PCA represented to them that their financial condition was critical and maintained that it would not continue to finance them through 1982 unless the Mantooths assigned as additional security a land purchase contract previously entered into with Brenda's father. The Mantooths claim that such representation of their financial condition was false because they still had a net worth in excess of $400,000. Since PCA had all the Mantooths' financial information in its file, its officers knew such representation was false. The Mantooths argue the representation was made with the intention that they would act upon it, which they did, believing they would receive full financing through the year. The Mantooths further argue that after inducing them to make the assignment, PCA took $79,000 from the Mantooths' account without their knowledge and consent to pay an intermediate term note not due for 22 months.

In its special findings, the trial court found that the Mantooths executed the contract assignment on or about January 20, 1982. It found that the testimony was conflicting as to whether PCA agreed to fund the Mantooths for the full year upon execution of the assignment because a PCA officer denied PCA had made such an oral promise. The court found that documentary evidence revealed that on January 11, 1982, the Mantooths executed a written request for an extension of their loan, due January 9, 1982, to April 9, 1982. The court determined that since the oral evidence of the promise conflicted with the documentary evidence, the Mantooths had failed to prove by a preponderance of the evidence that PCA promised to finance them for a full year upon the execution of the contract assignment. The court further found there was no proof the repre-

sentations were false, or if false, that PCA knew them to be false, or that the Mantooths had acted upon the representations to their detriment. At that time the hog operation had been liquidated, and the entire farming operation had been listed for sale.

■ Our examination of the record reveals evidence to support the court's findings. For fraud to be actionable, it must be shown there was a material representation of past or existing facts, which representation was false, made with the knowledge of its falsity, and caused reliance to the detriment of the party relying upon it. *First National Bank of New Castle v. Acra* (1984), Ind.App., 462 N.E.2d 1345.

■ The Mantooths have not demonstrated reversible error. We may not reweigh the evidence or redetermine the credibility of the witnesses. The Mantooths' financial position was poor and they could no longer meet their obligations. There is no showing that PCA's acts caused their financial collapse. Additionally, the Mantooths have presented no argument of fraud against FLB. We find no error.

ISSUE III: *Constructive Fraud and Breach of Fiduciary Duty*

■ The Mantooths claim that from 1963 onward, PCA assumed a fiduciary relationship toward them. They claim the fiduciary relationship was established in the following manner. Since 1963 the Mantooths depended upon and became subservient to PCA. They trusted PCA and PCA trusted them. PCA was a father figure to them. PCA controlled their funds, and the Mantooths depended upon it for their budget, living expenses, automobiles, and household goods. PCA also advised them as to how to conduct their farming operation. The Mantooths argue that upon PCA's advice they went into the hog production business in 1978, acquiring more debt with FLB, PCA's sister organization. They assert, however, that PCA, in the latter days of the events herein recited, had, as experts, advised them to liquidate their swine breeding stock. This was done to pay

PCA, but upon such liquidation the production of hogs ceased, crushing the Mantooths' operation. The Mantooths allege PCA used undue influence and duress to coerce them into making these moves, but turned on them, altering contracts, giving false notice of debt and liens to grain elevators, and disseminating confidential information to other creditors. The Mantooths argue that if they had kept the hog operation in production and ignored PCA's advice they would have prospered as a result of the dramatic increase in hog prices the following year.

In its special findings of fact and conclusions of law, the trial court rejected the Mantooths' contentions and the findings of the advisory jury. The trial court found that the evidence supported the conclusion that the relationship was only that of a creditor and debtor. However, the trial court found that there did exist a relationship of trust and confidence between PCA and the Mantooths. This relationship grew out of the full proceeds loan arrangement whereby all the gross proceeds from the sale of grain was remitted directly to PCA who paid the Mantooths' expenses pursuant to the annual budget. In that arrangement the Mantooths sought, and PCA officers gave, advice from time to time. Nevertheless, the Mantooths did not deal with PCA from any position of weakness and dependence. All major decisions regarding the farming operation and resulting incurrence of debt were made by the Mantooths. Although the Mantooths were encouraged by PCA, PCA never compelled or forced them to make any of the major decisions. The Mantooths determined to commence farming, buy land, borrow from PCA, and engage in the hog business in 1978, and were fully aware of the implication of such ventures. Most of the minor decisions were also made by the Mantooths. Even the annual budget was created by their own efforts after consultations with PCA officers. The Mantooths' debt to PCA grew from $80,925 in 1978 to $325,182 in 1982. Any position of weakness on the part of the Mantooths was a result of their deteriorating financial condi-

tion and was not imposed by PCA. From 1978 to 1982 the income from the farming operation was insufficient to pay the debt service upon which interest had increased to 15%. By 1982, interest expense alone was 33% of the projected gross income, and the Mantooths had begun to default on their debt. PCA's security position was weakened and it requested additional security in the nature of the farm contract. The trial court found that PCA did not take unfair advantage of the Mantooths by forcing them to liquidate the hog operation because by August of 1981, the Mantooths, contrary to PCA's advice, determined that a total sale of their farm operation was in their best interest. Therefore, they proceeded to sell the hogs and listed their farm operation for sale.

The Mantooths cite authority stating a confidential or fiduciary relationship may create, if accompanied by proper facts and circumstances, a presumption of undue influence. *Johnston v. Johnston* (1962), 134 Ind.App. 351, 184 N.E.2d 651, *trans. denied.* They also cite authority for the proposition that under proper facts a confidential or fiduciary relationship could exist between a borrower and lender. *Stone v. Davis* (1981), 66 Ohio St.2d 74, 419 N.E.2d 1094; *Klein v. First Edina National Bank* (1972), 293 Minn. 418, 196 N.W.2d 619. However, authorities are cited from other jurisdictions which hold that under similar facts no fiduciary relationship exists. *Umbaugh Pole Building Co., Inc. v. Scott* (1979), 58 Ohio St.2d 282, 390 N.E.2d 320; *Klein, supra.*

We have examined the record and conclude that the evidence most favorable to PCA and FLB supports the trial court's decision. The evidence shows that the Mantooths' initial entry into farming was at the suggestion of Brenda's father as well as the purchase of the farm on contract. The hog operation was solely the Mantooths' idea after having made a rather elaborate study of the matter by consulting numerous hog growers and representatives of feed companies, all independent of PCA. The day to day farm operation, upon which they kept careful records, was conducted by the Mantooths, not PCA. Instances exist where they ignored PCA's suggestions and demonstrated their independence by purchasing automobiles, removing Brenda's father as a co-signer, and seeking refinancing and liquidation.

There is no showing that any of PCA's acts caused the financial difficulty the Mantooths experienced during the recession of the early 1980's. Their argument seems to imply PCA was at fault for not saving them, rather than for causing their economic difficulties.

ISSUE IV: *Motion to Amend*

The Mantooths' complaint proceeded upon a theory of false and fraudulent misrepresentation by PCA. The evidence upon which they predicated this theory shows PCA advised the Mantooths to construct a hog barn and engage in a hog operation. They claim they followed PCA's advice to obtain a computer printout of projected earnings for the proposed hog operation from Purdue University. They further claim PCA misrepresented that their financial condition was poor.

At the close of the Mantooths' case-in-chief they moved for leave to amend the pleadings to conform to the evidence under Ind. Rules of Procedure, Trial Rule 15(B) to include recovery on the theory of negligent misrepresentation as well as fraud as discussed in *Eby v. York–Division, Borg Warner* (1983), Ind.App., 455 N.E.2d 623. The motion was denied and the Mantooths contend that such ruling was reversible error.

The trial court addressed the matter of the Purdue report in its findings. PCA never told the Mantooths that the Purdue projection would be accurate, but interoffice memos never shown to the Mantooths contained statements that such a projection would be more accurate than any projection it could make. Further, PCA had no independent knowledge that the projection was inaccurate or false. The court found that the projection was obtained by using data furnished to a county extension agent by the Mantooths who in turn ran it through the Model C–4 Program of Purdue University's Department of

Agriculture Economics. Both PCA and the Mantooths knew that the projection was a computer analysis and nothing more. The court finally found that the Mantooths had not carried their burden of proof as to their reasonable reliance upon the Purdue projection upon entering into the hog operation.

The Mantooths fail to cite to any evidence in the record which discloses why the recommendation and consideration of data generated by the Purdue University School of Agriculture Economics constituted negligence on the part of PCA. Information from that prestigious institution is used widely by farmers, county agents, and even governmental entities. Both PCA and FLB relied on it, in part, to make the loan. We hold that PCA's recommendation to obtain the projection was not negligent as a matter of law. Since there was no evidence in the record to justify the motion to amend, the court did not err in denying it.

Further, the facts show that the Mantooths' financial condition was poor in 1981 and 1982, and that fact was the basis for all that occurred. Thus, PCA was correct if they told the Mantooths it was poor. There was no falsity or negligence in this representation.

ISSUE V: *Joint Venture*

 The Mantooths claim a joint venture or partnership existed between PCA and themselves. Therefore, PCA should be liable for damages suffered by the Mantooths. They base their argument on the special relationship built up over the years with PCA and the full proceeds loan arrangement.

The trial court found that the relationship between the Mantooths and PCA commenced in 1964 when the Mantooths applied for a loan to purchase a one-half interest in the farm operation. From that time until 1982, the relationship consisted of a series of loans, mortgages, security interests, and the full proceeds loan arrangement. No agreement existed whereby PCA would share in the profits or losses with the Mantooths, nor did the Mantooths have any reasonable expectation that it would. In fact, the Mantooths never made

any demand that PCA share the losses and no partnership income or loss was reported by the Mantooths on their tax returns. Any payments the Mantooths made to PCA were for the repayment of principal and interest, stock, and closing expenses. The court concluded there was no evidence of a partnership or a joint venture, but the relationship was merely that of creditor and debtor.

Our examination of the record reflects evidence that supports the court's findings and conclusions. In *Boyer v. First National Bank of Kokomo* (1985), Ind.App., 476 N.E.2d 895, Judge Conover defined the requirements to create a joint venture:

A joint venture is an association of two or more persons formed to carry out a single business enterprise for profit, through the combination of their property and services. *O'Hara v. Architects Hartung and Association* (1975), 163 Ind.App. 661, 665, 326 N.E.2d 283, 286; *Baker v. Billingsley* (1956), 126 Ind.App. 703, 708, 132 N.E.2d 273, 275–76, *trans. denied.* A joint venture exists when an express or implied contract providing for (1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking, binds the parties to such agreement. Neither criterion is dispositive of the point, however. *See, Stallings v. Dick* (1965), 139 Ind.App. 118, 134, 210 N.E.2d 82, 91. *See also,* 48A C.J.S. *Joint Ventures* § 10 (1981). The joint venture agreement must provide for sharing of profits but it need not distribute them equally. *See, Lafayette Bank & Trust Co. v. Price* (1982), Ind.App., 440 N.E.2d 759, 762; 48A C.J.S. *Joint Ventures* § 13 (1981). Sharing of losses, if the losses involve only time and labor, need not specifically be in the joint agreement. *Lafayette Bank,* 440 N.E.2d at 762; *Davis v. Webster* (1964), 136 Ind.App. 286, 295, 198 N.E.2d 883, 887. Distribution of other losses and expenses may be implied from the manner in which profits are to be shared. 48A C.J.S. *Joint Ventures* §§ 13, 39 (1981). Where it is the intent of the parties for all co-venturers

to be subject to the risks of the business, a joint venture exists even though one co-venturer contributes capital and secures his contribution with a note. *See,* 48A C.J.S. *Joint Ventures* § 6 (1981). Finally, a joint venture is similar to a partnership except a joint venture contemplates only a single business transaction. A partnership, on the other hand, is formed for general business of a particular kind. *Lafayette Bank, supra,* 440 N.E.2d at 762; *Beck v. Indiana Surveying Co.* (1981), Ind.App., 429 N.E.2d 264, 268.

*Id.* at 897–98.

As required in *Boyer,* there is no evidence of any partnership or joint venture agreement, or any agreement whereby PCA would share the profits and losses. There was no right of control. This contention never arose during the course of the relationship, but surfaced after the fact in preparation for trial. We hold that the court did not err in determining a joint venture or partnership arrangement did not exist.

## ISSUE VI: *Excessive Attorney Fees*

The documents evidencing the Mantooths' indebtedness to PCA and FLB contained provisions entitling both to reasonable attorney fees. The trial court awarded FLB attorney fees as of the date of the partial summary judgment, October 21, 1985, in the sum of $8,612.75. Thereafter, at the conclusion of trial the trial court awarded FLB additional attorney fees of $37,141.33, making total attorney fees of $45,754.08. The trial court awarded PCA attorney fees in the total sum of $164,458.82.

It is evident the trial was long, complicated, and tedious. The Mantooths do not contest the right of PCA and FLB to attorney fees under the instruments, or the length of trial, the number of hours expended, or the hourly rate applied, nor do they debate that reasonable attorney fees would be for a lesser amount. The Mantooths argue only that the bulk of the attorney fees awarded were for the defense of their claim against PCA and FLB and that those entities should not be enti-

tled to attorney fees for that defense. They cite no authority for this proposition, however. Clearly, the counterclaim and the cross-claim grew out of the affirmative defenses the Mantooths made to the enforcement of PCA's and FLB's claims. The affirmative defenses of joint venture, partnership, fraud, lack of consideration, and breach of fiduciary duty were common to the counterclaim and cross-claim. The partial summary judgments did not dispose of those affirmative defenses which could have defeated PCA's and FLB's claims.

The amount of attorney fees is addressed to the sound discretion of the trial court, and we will not disturb its ruling absent a demonstration of an abuse of discretion. *Eyler v. Eyler* (1986), Ind., 492 N.E.2d 1071. PCA and FLB submitted evidence; the Mantooths submitted none. They have not demonstrated reversible error.

## ISSUE VII: *Misuse of Funds*

Here the Mantooths argue that when they built the hog facility in 1978, PCA issued to them a five year intermediate term loan (I–T loan) due in December of 1983. They claim that in January 1982, PCA persuaded them to assign to it the land contract with Brenda's father as additional security. Thereafter, on February 3, 1982, without the Mantooths' consent, PCA took money from the Mantooth's account in the amount of $79,395 to pay off the I–T loan, although it was not due until December of 1983. They argue that if they had retained those funds they could have paid FLB and other bills, thereby weathering the financial storm that engulfed them.

The record shows that in January of 1981, the Mantooths agreed in writing that if loan reduction and/or refinancing did not occur, they would sell sufficient assets to pay the PCA loan in full. Such reduction and refinancing did not occur and the Mantooths were in the process of liquidating the farm operation. At the same time of the payoff of the $79,395 I–T loan, PCA extended funding for the first quarter of 1982 and the $79,395 debt became part of the balance on that extension. All payments on the I–T loan had been made up to that point but $23,530 was due. We cannot

tell, but it would appear that the Mantooth account consisted also of loaned money.

The Mantooths accused PCA of manipulation of a trust fund, denominating it as theft. There is no evidence that PCA took any money for their own use. Rather, it was a mere transfer of debt from the I–T account to the operating fund debt. Whether or not such act was proper is immaterial to the ultimate debt the Mantooths owed PCA. By trial all debts were due and in default and many of them had been in default since January 9 or April 9 of 1982. All notes and security agreements contained provisions providing that if PCA felt insecure, or upon insolvency, bankruptcy, receivership, or default in payment, the entire balance would become due. Finally, we are unable to perceive how any of these matters contributed to the Mantooths' collapse. They have not demonstrated reversible error.

ISSUE VIII: *Sister Entities*

■■■ The trial court granted judgment on the evidence to FLB at the close of the Mantooths' case-in-chief. The Mantooths claim this action to be reversible error. The Mantooths argue that PCA, as their financial advisor, put them in contact with FLB in 1978 for the purpose of securing long-term financing for the hog operation. PCA told the Mantooths it made operating and I–T loans up to seven years, but it was necessary for them to go to FLB to get long-term financing for the hog facility.

They argue that both PCA and FLB report to the Federal Intermediate Credit Bank (FICB). The Mantooths rely on joint advertisement and cooperative efforts on the part of PCA and FLB. Such ads, containing pictures of handsome, eager, young farm couples, their faces radiating confidence and satisfaction, read in part, "PCA and FLB are farm credit specialists, ready to serve your credit needs, large or small, and on terms that are attractive." The ads show that PCA makes loans up to seven years, while FLB can make loans as long as 35 years. They mention the farm credit systems, production credit associations, and banks for cooperatives.

The evidence without dispute shows FLB is located in Louisville with its agent, FLB association, being located in Rushville. It is governed by a board of directors. FICB, a relative entity, also has a board of directors. Each is a separate bank which reports to the district farm credit board. PCA has its own directors. A certain amount of interlocking of directors is involved. FLB, PCA, and FICB are all creatures of an act of congress called the Farm Credit Act of 1971. All are chartered and governed by the Farm Credit Administration. They are separate corporate bodies and each has its own corporate seal. Each can make contracts, acquire and hold property, and sue and be sued. They are federally chartered and are instrumentalities of the United States. They are separate entities and have been judicially so recognized. *Stafford's Estate v. Progressive Nat. Farm Loan Ass'n.* (1945), 207 La. 1097, 22 So.2d 662; *Hinds v. Federal Land Bank of New Orleans* (1938), 235 Ala. 360, 179 So. 194; *Byrne v. Federal Land Bank of St. Paul* (1931), 61 N.D. 265, 237 N.W. 797; *Boyster v. Roden* (8th Cir.1980) 628 F.2d 1121. The entities do not share profits and losses. Funding for FLB, FICB, and PCA comes from the sale of bonds which each entity must repay.

We hold the trial court did not err in finding PCA and FLB were separate entities.

ISSUE IX: *Past Judgment Actions*

The Mantooths claim the court erred in permitting FLB and PCA to engage in proceedings supplemental after the judgment. From their brief, which is unsupported by facts and citation to authority, we are unable to understand the merits of their argument. In addition, these matters were not contained in the motion to correct errors. Consequently, the Mantooths have not demonstrated reversible error.

ISSUE X: *Sufficiency of the Evidence*

Finally, the Mantooths refer to numerous unspecified errors which they concede are redundant to the arguments made on other issues. They cite us generally to the motion to correct error in the appendix, which motion is 51 pages long. The argument

contains no citation of authority. Therefore, any error is waived for lack of citation of authority and lack of cogent argument. *Williams v. State* (1973), 260 Ind. 543, 297 N.E.2d 805; *Wright v. State* (1982), Ind.App., 436 N.E.2d 335; Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

For all of the above reasons this cause is affirmed.

JUDGMENT AFFIRMED.

SHIELDS and GARRARD, P.JJ., concur.