Larry JEPPESEN, Plaintiff–Appellee, Cross–Appellant,

v.

David RUST and Marcus Rust, Defendants–Appellants, Cross–Appellees,

and

Rose Acre Farms, Inc., Defendant–Appellee.

Nos. 92–3352, 92–3427.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1993.

Decided Nov. 5, 1993.

Lee T. Hettinger and Edward Dismukes (argued), Rooks, Pitts & Poust, Chicago, IL, Michael A. Cotteleer, Wheaton, IL, for plaintiff-appellee.

Corinne Finnerty, McConnell & Finnerty, North Vernon, IN, Terrill D. Albright (argued), Stephen H. Paul, Ronald D. Gifford, Baker & Daniels, Indianapolis, IN, Dinah L. Archambeault, Neil T. Goltermann, Charles L. Bretz, Patricia A. Schneider, Spesia & Ayers, Roger D. Rickmon, Herschbach, Tracy, Johnson, Bertani & Wilson, Joliet, IL, for defendants-appellants.

Before EASTERBROOK and MANION, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

In 1985 Rose Acre Farms was the fourth largest egg producer in the United States and growing rapidly. It was building an automated facility in White County, Indiana, housing about 1.5 million hens, and planned to construct similar facilities at the rate of one per year. Rose Acre used conveyer belts to move the eggs directly from chicken to carton, washing, drying, and sorting the eggs by size along the way. Integrated collection and packaging reduced Rose Acre's costs but also left some eggs with tiny cracks. If more than 5% of eggs had checks (the name for such cracks), the United States Department of Agriculture would not apply its Grade A seal; as a result Rose Acre sold most of its eggs without federal certification.

Larry Jeppesen, at the time a self-employed consultant on the marketing of eggs, proposed to Marcus Rust, a director and vice-president of Rose Acre, that Jeppesen take charge of marketing eggs from the new White County facility. Jeppesen proposed to sell the eggs to retail groceries (a market he knew well); to get top dollar, the eggs would need USDA certification. After an exchange of correspondence, Marcus agreed to Jeppesen's proposal, which called for him to receive a stated salary ($100,000 the first year, fall-ing to $60,000 the third) against one-third of the profits. Marcus and his father David (who owned a majority of Rose Acre's shares) were to split the rest of the profits. American Egg Company, as Jeppesen called the unincorporated marketing operation, would buy eggs from Rose Acre at the best price Rose Acre offered to any customer and would have the exclusive right to market Rose Acre's production from White County. Jeppesen agreed to pay the cost of bringing USDA inspectors to the site so that qualifying eggs could receive the Grade A seal. This agreement was memorialized in a letter Jeppesen sent to Marcus, and a handwritten note back from Marcus. Rose Acre's board did not vote on this proposal, although David and Marcus Rust stood on both sides of the transaction.

By mid–1986, after a year of operation, American Egg's sales were short of expectations. Groceries wanted large, USDA-certified Grade A eggs. The size of eggs increases with the age of the pullets, and those at White County were still young. The USDA certified as Grade A only about half of the facility's production. Jeppesen therefore sold a large fraction of the eggs to the wholesale trade, at lower prices than retailers would have paid for the kind of eggs consumers prefer. American Egg's largest customer was Boomsma, Inc., a producer of eggs and a jobber for other producers' surplus. One of Rose Acre's larger competitors, Boomsma was among six plaintiffs in an antitrust suit charging Rose Acre with predatory pricing. In August 1986 Rose Acre decided to sell Boomsma the entire production of its White County facility at a substantial discount; the Rusts expected Boomsma to dismiss the antitrust suit in exchange. American Egg was dropped. In January 1987 Rose Acre stopped selling to Boomsma, which had not dismissed the suit. At this point Rose Acre had the worst of both worlds: Boomsma was still pursuing its claim under the antitrust laws, and Jeppesen had filed this suit under the diversity jurisdiction charging the Rusts and Rose Acre with breach of contract and interference with his business of selling eggs to Boomsma.

Each jury decided against Rose Acre. In the antitrust case the jury returned a verdict of $28 million after trebling, but the district court entered judgment in Rose Acre's favor after concluding that it lacked market power. We affirmed. *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir.1989). In Jeppesen's suit the jury concluded that both Marcus and David Rust breached their joint venture agreement and awarded $140,000 in compensatory damages against both Rusts plus $20,000 in punitive damages against Marcus Rust. The jury also concluded that David Rust (but not Marcus) had interfered with the Jeppesen–Boomsma business and awarded an additional $60,000 in punitive damages. Before sending the case to the jury, the district court granted judgment as a matter of law in favor of Rose Acre, holding that no evidence supported Jeppesen's claim that the corporation was one of the joint venturers. The judge rebuffed all challenges to the jury's verdict, leading to cross-appeals: The Rusts crave exoneration, and Jeppesen wants damages from Rose Acre.

█ Let us start with Jeppesen's claim against Rose Acre. According to Jeppesen, Rose Acre broke its promise to sell the entire output of the White County facility through American Egg. This argument fails for multiple reasons. (i) In the district court Jeppesen argued that Rose Acre was a *participant* in the joint venture, not that it was an outsider obliged by contract to give the joint venture exclusive distribution rights. The district court decided that the evidence did not support Jeppesen's contention, which he has abandoned on appeal. The contract argument, not having been presented to the district judge, is waived. Indeed, Jeppesen has waived any opportunity to contest the waiver possibility. Rose Acre raised this obstacle in its brief, and Jeppesen ignored the point altogether; at oral argument his lawyer vaguely alluded to things that might or might not have been said in the conference on jury instructions, but this was too late to contest the point—too late in both courts. (ii) The right plaintiff on a contract theory would be the joint venture itself: American Egg. Yet American Egg is not a party, and for two good reasons: first, its presence would destroy diversity of citizenship; second, Jeppesen owned only a third of American Egg, and the Rusts, who held the rest, could have prevented it from filing suit. (iii) None of the documents specifies a term for any exclusive distributorship. When the parties do not set their own duration for a contract, Indiana law (which the parties agree governs) provides that the term is at will. *House of Crane Inc. v. H. Fendrich, Inc.*, 146 Ind.App. 478, 256 N.E.2d 578 (1970); *Monon R.R. v. New York Central R.R.*, 141 Ind.App. 277, 227 N.E.2d 450, 456 (1967). Rose Acre did not sell behind American Egg's back during a period of supposedly exclusive dealing; it made a clean break of things, as is appropriate for a contract terminable at will.

█ Jeppesen's principal contention is that the Rusts violated the terms of the joint venture they established. The Rusts concede that if there was a joint venture they are liable to Jeppesen, but they deny that there was such a venture. The jury resolved this question against them, and the evidence supports its decision. We may assume that in Indiana a "joint venture" is an unincorporated association in which the participants share profits and losses, although the cases do not squarely hold that loss-sharing is a necessary ingredient. See *Mantooth v. Federal Land Bank of Louisville*, 528 N.E.2d 1132, 1140–41 (Ind.App.1988); *Baker v. Billingsley*, 126 Ind.App. 703, 132 Ind.App. 273, 276 (1956). According to the documents, Jeppesen and each of the Rusts was to receive one-third of the profits, and Marcus's letter accepting Jeppesen's proposal trumpets: "so you can see you are a [sic] *owner!*" (emphasis in original). According to the Rusts, Jeppesen was their employee rather than a co-venturer because he was to receive a stated salary against profits; if Jeppesen's income could not fall below this draw, how could he share in the losses, the Rusts inquire? One answer is that the documents do not depict the salary as a guarantee; Marcus's letter calls the first year's income "100,000 + bal of ⅓ profits". If "profits" in that year were a negative number, Jeppesen would have received less than $100,000 according to that formula. Jeppesen testified

that "it was assumed" that he would share in losses. Another possibility, also supported by Jeppesen's testimony: profits and losses would be averaged over time, so that Jeppesen could share in the losses even if his net income in any year did not fall below $60,000. Suppose American Egg lost $1 million in one year and made $1.5 million the next. Jeppesen would receive $60,000 the first year, and the loss would carry forward to the second, when he would receive $106,667 rather than the $500,000 that would have been his due had there been no prior losses. The two-year net profit is $500,000, of which Jeppesen's third is $166,667; because he received $60,000 in the first year, he would receive the remaining $106,667 in the second, perhaps diminished by interest payable on the "advance" of $60,000. The difference between $500,000 and $166,667 would be Jeppesen's contribution toward the first year's loss. Law firms refer without embarrassment to "contract partners" and "non-equity partners" (the firms on both sides of this case include lawyers with this position); a jury was entitled to conclude that Jeppesen occupied a similar status at American Egg.

David Rust insists that he cannot be held liable as a co-venturer because he did not negotiate with Jeppesen or sign the letter by which Marcus Rust agreed to Jeppesen's terms. Yet the jury could conclude that Marcus acted in the transaction as David's agent. Both the letters and Rose Acre's own financial statements depict David as a partial owner of American Egg, and David acted accordingly. For example, David instructed Jeppesen to remove Jeppesen's daughter from American Egg's payroll, a step he could not have taken if he were merely American Egg's supplier.

■ Although Jeppesen therefore is entitled to his award on the joint venture theory (the various objections to the district court's evidentiary rulings are insubstantial), the punitive damages are more problematic. Jeppesen apparently chose the joint venture portrayal, rather than a suit on the written contract, in order to depict the Rusts as his fiduciaries and set up a claim for punitive damages that Indiana does not permit for simple breach of contract. *Miller Brewing*

*Co. v. Best Beers of Bloomington, Inc.,* 608 N.E.2d 975, 983–84 (Ind.1993); *Lawyers Title Insurance Corp. v. Pokraka,* 595 N.E.2d 244, 250 (Ind.1992). When the Rusts had an opportunity to do well for Rose Acre by selling to Boomsma rather than American Egg, they took it, thereby (Jeppesen believes) defaulting on their duty of *undivided* fidelity to their co-venturer. Yet it is hard to believe that Indiana law requires the Rusts to serve Jeppesen to the exclusion of all others. Both Rusts were officers and directors of Rose Acre and owed it, too, a duty of loyalty. If they erred, it was by excessive rather than insufficient loyalty to American Egg. As directors of Rose Acre, the Rusts were not supposed to appropriate a corporate opportunity (which the opportunity to market Rose Acre's eggs was) without disclosure to their fellow board members and a formal resolution of approval. Ind.Code Ann. § 23–1–35–2; see also ABA, *Model Business Corporation Act* subchapter F (1988 rev.); ALI, *Principles of Corporate Governance: Analysis and Recommendations* § 5.05 (1993). That Rose Acre is closely held does not matter; David and Marcus did not own all of the stock, and they were obliged to manage in the interests of all of its investors.

■ Jeppesen understood the situation. He approached Marcus precisely because he was a vice-president and director of Rose Acre, and Jeppesen had to know that Marcus's first loyalty would be to the family firm. Jeppesen's own proposal stated: "I believe it is in the company's best interest to be free to terminate our relationship without penalty", and he testified that, as he conceived the venture, "either party should be able to, you know, shake hands and go away." The jury must have concluded that despite this language the joint venture could not be terminated at will. (The Rusts do not pursue this point.) Still, why would Indiana want corporate directors to disregard the interests of their firms and funnel income to a marketing venture, when the very existence of that venture is dubious under corporate law? The antitrust suit jeopardized Rose Acre's existence (the jury's award of $28 million meant bankruptcy and dissolution); trying to avoid that calamity, which is how Jeppesen

depicts the switch from American Egg to Boomsma, is exactly how Indiana would wish corporate officers to conduct themselves. If saving the corporation means breaking a contract, then compensatory damages are in order. We are confident, however, that Indiana does not use punitive damages to compel corporate directors to accept the greater evil and avoid the lesser. To obtain punitive damages in Indiana the plaintiff must show "by clear and convincing evidence that the defendant's actions in breaching the contract were accompanied by malice, fraud, gross negligence, or oppressive conduct." *Dahlin v. Amoco Oil Corp.*, 567 N.E.2d 806, 810 (Ind.App.1991). See also *Lawyers Title*, 595 N.E.2d at 250; *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.*, 507 N.E.2d 588, 613 (Ind.App.1987). None of these epithets is apt when persons must choose *between* duties of loyalty, as the Rusts did.

The final $60,000 of the judgment depends on the jury's finding that David Rust (but not his son) intentionally interfered with Jeppesen's business of selling eggs to Boomsma. The principal dispute is whether this tort requires improper conduct independent of the breach of contract. Indiana cases articulate an independent-wrong requirement. *Helvey v. O'Neill*, 153 Ind.App. 635, 288 N.E.2d 553, 561 (1972); *Furno v. Citizens Insurance Co.*, 590 N.E.2d 1137, 1139–40 (Ind.App.1992). See *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 542–43 (7th Cir.1986) (Indiana law). See also Harvey S. Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Tort and Contract Theory*, 49 U.Chi. L.Rev. 61, 69–78 (1982). The district court held, however, that a fiduciary's breach of the duty of loyalty can substitute for an independently wrongful act. We believe that this conclusion is mistaken. The reason is simple. Indiana has defined with care the elements of breach of contract and the damages available. These rules of law (including the rule limiting the award of punitive damages for breach of contract) would be hollow if the plaintiff could transmute the breach into the tort of interference with business relations—which on Jeppesen's view almost always would be possible. The tort would become a wild card, inviting the jury to disregard the elements of the contract claim and the limitations on available damages. Consider: **A** agrees to sell ten tons of turnips to **B**. Breaking its promise, **A** sells the turnips to **C** instead. Contract law requires **A** to compensate **B** for the difference between the contract price and the cost of "cover" in the turnip market, and there are sound reasons for limiting the damages to this amount. See Perlman, 49 U.Chi.L.Rev. at 79–85. Yet **B** could recharacterize this breach as the "tort" of interfering with **B**'s business of selling the turnips it had contracted to buy from **A**. Now **A** *could* interfere with **B**'s business in the tort sense by throwing a stick of dynamite into **B**'s premises, or by slandering **B** so that **B**'s customers deserted; these would be torts independent of **A**'s failure to deliver the turnips, properly leading to additional damages. Nothing of the sort happened here. Treating the "fiduciary" element of the joint venture as an independent wrong is not helpful, because the focus of the case remains on the contract: David Rust's obligations depend on that agreement, and as a director of Rose Acre he was not unconditionally obliged to prefer American Egg in all dealings.

American Egg was a joint venture devised to sell the production of Rose Acre's facility in White County. After a year had passed, David Rust decided to sell the eggs through Boomsma instead. It is impossible to conceive of this as a wrong "independent" of the joint venture agreement—something Jeppesen himself acknowledged when omitting any request for compensatory damages on this account. (On Jeppesen's theory, any injury from the "interference" is a subset of the injury from the dissolution of the joint venture.) A change in the middleman was wrongful, if at all, only because of the joint venture agreement. To put this somewhat differently, David did not commit a wrong such as slander that induced Boomsma to stop buying what American Egg held for sale. Instead Rose Acre stopped selling eggs to American Egg. Jeppesen was free to buy eggs from other sources and offer them to Boomsma; for all this record reveals, Boomsma would have been happy to

buy them (at the right price). Jeppesen's complaint is that David stopped *selling* to American Egg, not that he used illegal means to induce Boomsma to stop *buying*. A jury properly instructed about the need to find improper means independent of the breach of contract could not have ruled in Jeppesen's favor, so we set the award aside without remanding for a new trial.

The awards of compensatory damages are affirmed, and the awards of punitive damages are reversed.