**Richard HOFFMAN, Patricia A. Hoffman and Haufman House, Inc., Appellants–Plaintiffs,**

**v.**

**LINCOLN NATIONAL BANK AND TRUST COMPANY, Appellee–Defendant.**

No. 35A05–9302–CV–55.

Court of Appeals of Indiana, Fifth District.

June 27, 1994.

Transfer Denied Oct. 12, 1994.

Jerrald A. Crowell, John C. Bohdan, Moss, Crowell, Harris, Yates & Long, Fort Wayne, for appellants-plaintiffs.

John D. Walda, Kevin K. Fitzharris, Barrett & McNagny, Fort Wayne, for appellee-defendant.

BARTEAU, Judge.

Richard and Patricia Hoffman and the Haufman House Restaurant (collectively "Hoffmans"), obtained a jury verdict against Lincoln National Bank and Trust Co. ("LNB") on their claim that LNB's actions surrounding a commercial loan to Hoffmans amounted to a breach of fiduciary duty on the part of LNB. The trial court granted LNB's Motion to Correct Error and set aside the jury verdict because there was insufficient evidence to support the verdict. We will address the following issues on appeal:

I. Whether the trial court erred in granting LNB's Motion to Correct Error; and

II. Whether the trial court's ruling on LNB's Motion to Correct Error is fatally defective due to the trial court's failure to make a finding as to why judgment was not entered on the evidence.

### FACTS

Richard and Patricia Hoffman were sole shareholders of Haufman House, Inc., a family operated restaurant, which began as a carry-out operation in 1965 in Maplewood Plaza in Fort Wayne, Indiana. Hoffmans eventually expanded this operation to include a dining room. In 1983, Hoffmans decided to construct a new, larger restaurant. They purchased some land about a mile from Maplewood Plaza on which to build the new facility. LNB financed the purchase of the land.

Hoffmans then proceeded to hire an architect who drew up the plans. They then began to take bids on the project. The project was awarded to Jerry Werling. Hoffmans again sought financing from LNB to finance the building of the new restaurant. LNB agreed to lend them $405,000 under the following conditions: Hoffmans would obtain a guarantee from the Small Business Administration (SBA); the proceeds from the sale of the restaurant in Maplewood would be used as capital for the new business venture; a first mortgage on the property would be executed in favor of LNB; LNB would have a security interest in all equipment in the restaurant; a second mortgage on Hoffmans's personal residence would be executed in favor of LNB; and Hoffmans would assign a life insurance policy on the life of Richard Hoffman to LNB. Hoffmans complied with these conditions. Construction of the restaurant began September 7, 1983, and the loan closed on October 24, 1983. At closing, Hoffmans asked their loan officer from LNB whether LNB would fund cost overruns. Hoffmans were told that LNB "could" fund the overruns. Hoffmans were not represented by counsel at closing.

Hoffmans's payment on the loan was $4,899 a month. The loan had a variable interest rate which was 13½% for the first quarter. Thereafter, the rate was to be 2½% above the "minimum prime rate charged by large U.S. money center commercial banks to their best business customers." The rate was re-calculated every quarter. Thus, it was conceivable under the terms of the loan that the fixed monthly payment of $4,899 would not be sufficient to pay the monthly interest. The first payment was due on January 24, 1984; however, Hoffmans did not make a payment until May of that year. LNB agreed to defer the four missed payments until the end of the loan's term.

Hoffmans contracted with Werling Construction Co. to build the restaurant for $279,060. The contract did not cover the cost of finishing the interior of the building, the cost of finishing the parking lot and the cost of necessary equipment. When the building was complete, Hoffmans incurred an additional $20,000 in debt to Werling Construction. Hoffmans incurred additional debt by purchasing necessary equipment for the restaurant.

Needing more money to pay their debts, Hoffmans approached LNB for additional fi-

nancing, which was refused. They continued to operate the restaurant, which at first enjoyed a brisk business, but operated at a loss in 1984. LNB met with Hoffmans several times in 1984 to explore other options instead of foreclosure on the loan. It is unclear whether any definitive action was taken on the loan in 1984 other than to allow Hoffmans to continue to run the business.

Hoffmans were unable to continue making regular payments on the loan and finally listed the restaurant for sale in the summer of 1985. Hoffmans obtained buyers, Mr. Radu and Mr. Pickles, who had hoped to assume the loan. LNB would not agree to this. Nevertheless, Hoffmans permitted Radu and Pickles to take possession of the restaurant in November of 1985 in order to remodel. LNB was unaware that Mr. Radu and Mr. Pickles had taken possession until someone from LNB heard that the Haufman House sign was being removed. Upon further investigation, LNB learned that its collateral was being removed, new equipment was being brought in, and walls were being torn down. LNB was required to hire someone to recover the equipment which had been removed.

Negotiations between LNB and Hoffman ensued. Finally, an agreement was reached whereby Hoffmans deeded the property on which the restaurant was located and their residence to LNB in exchange for a release of their obligation to LNB. They also agreed to transfer a three-way liquor permit to LNB. LNB was required to pay all costs and expenses necessary to effect the renewal of the permits except for state taxes, which Hoffmans were required to pay. LNB then liquidated the property instead of invoking the SBA guarantee.

In an amended complaint filed in February, 1989, Hoffmans alleged LNB breached a fiduciary duty to them by failing to cover cost overruns even though the SBA guarantee would have covered the additional financing; failing to insure the validity of the SBA guarantee; seizing their property without notice; failing to exercise the SBA guarantee; agreeing to accept delinquent payments and then foreclosing on the loan; failing to advise Hoffmans when the loan was in negative amortization (i.e., the monthly payments were insufficient to pay the monthly interest charges); and publicizing the financial problems of the restaurant. Hoffmans claimed that these actions caused them to suffer a loss of business at the restaurant until they were ultimately required to give up the restaurant. Hoffmans also alleged promissory estoppel and breach of written and oral contracts. LNB filed a counterclaim, seeking reimbursement for state taxes it paid on Hoffmans's behalf in order to complete transfer of the liquor license.

The jury trial began on October 12, 1992. After Hoffmans's case-in-chief, the trial court granted LNB's motion for directed verdict on Hoffmans's breach of contract and promissory estoppel claims, but the issue of whether LNB had breached a fiduciary duty to Hoffmans was presented to the jury. The jury returned a verdict in favor of Hoffmans for $60,000 and in favor of LNB for $9,000 on its counterclaim.

Three days after the verdict, LNB filed a Motion to Correct Error, seeking judgment on the evidence as to Hoffmans's claim against it. The court granted LNB's motion on October 27, 1992, finding that there was no evidence to support Hoffmans's claim that LNB breached a fiduciary obligation to Hoffmans. On the same day, the court ordered a remittitur on LNB's counterclaim, finding that the evidence supported a verdict for LNB of only $8,070.13. The court vacated these orders on November 2, 1992, because the trial minutes had not been entered. After the minutes were entered, the trial court reaffirmed its October 27 rulings on November 2, 1992. Hoffmans filed a Motion to Correct Error on November 24, 1992, which was denied by the trial court. This court heard oral argument on June 7, 1994, in Indianapolis, Indiana.

### STANDARD OF REVIEW

LNB moved for judgment on the evidence by way of a Motion to Correct Error as provided in Ind. Trial Rule 50(A)(4). When considering a motion for judgment on the evidence after a jury verdict, the trial court may consider only the evidence and reasonable inferences flowing therefrom favorable

to the non-moving party. *Huff v. Travelers Indem. Co.* (1977), 266 Ind. 414, 363 N.E.2d 985; *Elsperman v. Plump* (1983), Ind.App., 446 N.E.2d 1027. Judgment may not be entered unless there is no substantial evidence or reasonable inference therefrom to support an essential element of the claim. *Elsperman,* 446 N.E.2d at 1029–30. There must be a complete failure of proof and the evidence must point unerringly to a conclusion not reached by the jury. *Id.* The trial court may not weigh the evidence in ruling on a motion for judgment on the evidence following a jury verdict. *Id.*

On review of the grant of a motion for judgment on the evidence, this court employs the same standard used by the trial court. *Id.* We must examine whether there is evidence of probative value to support each essential element of the claim. If there is relevant evidence to support the claim, but the evidence conflicts, the verdict is not clearly erroneous and judgment on the evidence notwithstanding the verdict is improper. *Id.*

### FIDUCIARY DUTY

◼ This court has stated, in *dicta,* that where there is a confidential relationship between a bank and its customer, a fiduciary obligation might be imposed on the bank. The factors necessary to establish a confidential relationship were outlined by the court in *Peoples Trust Bank v. Braun* (1983), Ind. App., 443 N.E.2d 875, 879, *reh'g denied,* as follows:

'Although the existence of a confidential relationship depends upon the facts of each case, it can be generally stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage.'

*Id.* at 879 (quoting *Hunter v. Hunter* (1972), 152 Ind.App. 365, 283 N.E.2d 775, 779) (citations omitted). In *Peoples Trust Bank,* this court reversed a determination that the bank had breached its fiduciary duty because the court's findings were not adequate to support the determination as required by T.R. 52(D).

In *Nicoll v. Commun. State Bank* (1988), Ind.App., 529 N.E.2d 386, *reh'g denied, trans. denied,* this court refused to find a fiduciary duty between Community State Bank (CSB) and the Nicolls by affirming the grant of summary judgment in favor of the bank on the Nicolls's claim. The Nicolls executed two notes with CBS—one on which they were personally liable and one on which their landlord was also liable. The latter note was used to buy feeder cattle. As collateral for the loan, the Nicolls were required to purchase a hedging contract, which was assigned to CSB. The Nicolls purchased the hedging contract, the first hedging contract Mr. Nicoll had ever purchased. The contract called for delivery of steers; however, the Nicolls could not satisfy the contract because they owned only two steers. The Nicolls eventually asked CSB to cancel the contract because they were losing money. CSB refused. The Nicolls paid off the note used to buy the feeder cattle, but CSB sued them on the personal note. The Nicolls claimed CSB had breached a fiduciary duty to them and the trial court granted summary judgment in favor of CSB. This court affirmed the grant of summary judgment, finding that the Nicolls had failed to present evidence that they reposed any confidence in CSB in the transactions.

This court again refused to impose a fiduciary duty between the bank/lender and the customer/borrower in *Mantooth v. Federal Land Bank* (1988), Ind.App., 528 N.E.2d 1132, *reh'g denied, trans. denied.* According to the court, Mantooths claimed the fiduciary relationship was established as follows:

Since 1963 the Mantooths depended upon and became subservient to PCA. They trusted PCA and PCA trusted them. PCA was a father figure to them. PCA controlled their funds, and the Mantooths depended upon it for their budget, living expenses, automobiles, and household

goods. PCA also advised them as to how to conduct their farming operation. The Mantooths argue that upon PCA's advice they went into the hog production business in 1978, acquiring more debt with FLB, PCA's sister organization. They assert, however, that PCA, in the latter days of the events herein recited, had, as experts, advised them to liquidate their swine breeding stock. This was done to pay PCA, but upon such liquidation the production of hogs ceased, crushing the Mantooths' operation. The Mantooths allege PCA used undue influence and duress to coerce them into making these moves, but turned on them, altering contracts, giving false notice of debt and liens to grain elevators, and disseminating confidential information to other creditors. The Mantooths argue that if they had kept the hog operation in production and ignored PCA's advice they would have prospered as a result of the dramatic increase in hog prices the following year.

*Id.* at 1138. The trial court found that although Mantooths sought, and PCA gave, advice from time to time, Mantooths did not deal with PCA from a position of weakness and dependence, as Mantooths continued to make all decisions regarding the farming operations and the incurrence of debt. This court affirmed, finding that any position of weakness on the part of Mantooths was a result of their deteriorating financial status.

Like Mantooths, Hoffmans blame their financial woes on their bank. They point to the following as demonstrating the existence of a confidential relationship: They were unsophisticated in financial matters. LNB had, in the past, paid cost overruns on construction projects. Hoffmans had done all of their banking with LNB and had turned to LNB for most of their financial needs and advice. They relied on LNB for guidance in financing the new project. LNB encouraged them to begin building before the loan had been closed. According to Hoffmans, they were in no position at closing—because construction had already started pursuant to LNB's urging—to refuse the terms of the loan. Further, LNB knew before making the loan the business was undercapitalized.

Hoffmans also fault LNB for not covering cost overruns on the instant project, for failing to seek an extension of the SBA guarantee and for not notifying them of the negative amortization. According to Hoffmans, LNB also interfered with the operation of their business.

It is true that there is evidence in the record which would support these contentions. However, assuming, arguendo, that these facts are sufficient to give rise to a confidential relationship, Hoffmans have failed to present evidence on every element of their claim. In order to show a breach of fiduciary duty, Hoffmans were required to present evidence as to an unconscionable advantage gained by LNB in its dealings with Hoffmans. *Hunter,* 152 Ind.App. 365, 283 N.E.2d 775, *op. clarified by* (1973), 156 Ind. App. 187, 295 N.E.2d 834. The record reveals that LNB lost over $70,000 in this transaction. As there is no evidence to support this element, judgment notwithstanding the verdict was properly entered.

We also note that, like Mantooths, Hoffmans made the business decisions. They decided to build the restaurant and to borrow money from LNB. Although Mr. Hoffman discussed the original building plans with LNB, he ordered all changes to the construction contract without consulting LNB. We also note that during the time Hoffmans were buying the property and dealing with LNB, they had an attorney and an accountant. The note from LNB as well as the SBA guarantee were in writing; however, Hoffmans admit they chose not to read them, relying on LNB instead. Hoffmans also made decisions with regard to the every day operation of the restaurant.

Further, the record reveals that Hoffmans's expenses in operating the restaurant were higher than projected and income was lower than projected. Even though Hoffmans were in default, LNB tried to work with them to keep the business operating. With respect to the SBA guarantee, LNB was not required under the terms of the loan to invoke the guarantee before foreclosing on the property.

We agree with the trial court that Hoffmans failed to present evidence to support every element of their claim.

### TRIAL COURT'S FINDINGS

■ Hoffmans argue that the trial court's findings did not comply with T.R. 59(J), which provides in part:

> ... if the decision is found to be clearly erroneous as contrary to or not supported by the evidence the findings shall show why judgment was not entered on the evidence.

After Hoffmans's case-in-chief, LNB moved for a directed verdict on all causes of action. The trial court granted the motion with respect to Hoffmans's breach of contract and promissory estoppel claims, but allowed the question of fiduciary duty to proceed to the jury. After the jury verdict, the court granted LNB's motion for judgment on the evidence. Hoffmans argue that the court was required to state, in ruling on that motion, why it did not grant the first motion for directed verdict.

■ When the above-quoted rule is read in the context from which it has been extracted, it is clear that the requirements apply only when a new trial is granted:

> *When a new trial is granted* because the verdict, findings or judgment do not accord with the evidence, the court shall make special findings of fact upon each material issue or element of the claim or defense upon which a new trial is granted. Such finding shall indicate whether the decision is against the weight of the evidence or whether it is clearly erroneous as contrary to or not supported by the evidence; if the decision is found to be against the weight of the evidence, the findings shall relate the supporting and opposing evidence to each issue upon which a new trial is granted; if the decision is found to be clearly erroneous as contrary to or not supported by the evidence, the findings shall show why judgment was not entered upon the evidence. (emphasis supplied).

Both the grant of a new trial and entry of judgment on the evidence must be supported by findings. *Coffel v. Perry* (1983), Ind.App., 452 N.E.2d 1066, 1068. Under T.R. 59(J), the grant of a new trial requires detailed findings of fact. *Id.* Entry of judgment on the evidence, on the other hand, requires only a statement of general reasons. *Id.* Here, the trial court found that the evidence, taken in a light most favorable to Hoffmans, did not establish the existence of a fiduciary relationship. These findings are adequate.

### CONCLUSION

The decision of the trial court granting judgment on the evidence is affirmed. Because we affirm the trial court, we do not address Hoffmans's argument that the jury verdict in their favor was inadequate.

AFFIRMED.

SHARPNACK, C.J., and NAJAM, J., concur.