### The HUNTINGTON MORTGAGE COMPANY, Appellant–Defendant,

v.

### Steven D. DeBROTA and Mark K. Dudley, Individually and on behalf of themselves and others similarly situated, Appellees–Plaintiffs.

No. 49A05–9708–CV–361.

Court of Appeals of Indiana.

Nov. 6, 1998.

Evan E. Steger, Kristin L. Altice, Ice Miller Donadio & Ryan, Indianapolis, for Appellant–Defendant.

Steven R. Schafer, Kroger Gardis & Regas, Indianapolis, William E. Cumberland, Mortgage Bankers Assn. of America, Washington, DC, for Amicus Curiae, Mortgage Bankers Association of America.

Theodore J. Nowacki, Bose McKinney & Evans, Indianapolis, for Amici Curiae, Indiana League of Savings Institutions, Inc. and Indiana Bankers Association, Inc.

T. Neil Bemenderfer, Mark R. Smith, Smith & Bemenderfer, Indianapolis, Richard A. Freese, Langston Frazer Sweet & Freese, Birmingham, for Appellees–Plaintiffs.

## OPINION

SHARPNACK, Chief Judge.

This case comes to us on interlocutory appeal. Huntington Mortgage Company ("Huntington") appeals the trial court's denial of their motion for summary judgment in favor of the plaintiff-appellees, Steven D. Debrota and Mark K. Dudley (collectively "Appellees"). Huntington raises two issues which we restate as follows:

1) whether the Appellees were contractually obligated to pay private mortgage insurance ("PMI") premiums under the terms and conditions of their mortgage agreements with Huntington; and

2) whether the relationship between Appellees and Huntington was one that

required Huntington to make certain disclosures to Appellees regarding PMI. We reverse.

## Facts

The undisputed facts follow. The Appellees each financed the purchase of homes with mortgages from Huntington, a mortgage lender and servicer. Appellees were either unable or unwilling to make down payments of 20% of the purchase price necessary to obtain conventional mortgages. The secondary mortgage market[1] requires that when the loan-to-value ratio ("LTV")[2] is 80% or greater, premiums for PMI[3] must be paid by the borrower. The Appellees each secured their mortgages with Fannie Mae/Freddie Mac Uniform Instruments. Following the execution of the mortgage agreements, the Appellees began paying the PMI premiums. Huntington forwarded these premiums to the insurance carriers who then issued the PMI policies.

The Appellees filed a class action suit against Huntington. Appellees' Amended Complaint set forth seven causes of action: (1) breach of contract; (2) suppression of material facts; (3) conversion; (4) civil conspiracy; (5) breach of fiduciary duty; (6) common law bailment; and (7) unjust enrichment. Huntington then filed a motion for summary judgment asserting that the Appellees were contractually obligated to pay PMI premiums for the life of the mortgage and that the relationship between Huntington and Appellees did not require Huntington to make certain disclosures to Appellees regarding PMI. The trial court denied Huntington's motion for summary judgment. Huntington then filed its praecipe for this interlocutory appeal.

## Standard of Review

The sole issue raised for our review is whether the trial court erred in denying summary judgment. When we review a trial court's denial of a motion for summary judgment, we are bound by the same standard as the trial court. *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.*, 493 N.E.2d 1229, 1234 (Ind.1986); *see* T.R. 56. The appellant bears the burden of proving the trial court erred in determining that there were genuine issues of material fact or that the moving party was not entitled to judgment as a matter of law. *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmovant. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v.*

1. Some lenders keep the mortgages they originate while others sell the loans on the secondary mortgage market. After the loan is sold, it is serviced either by the lender that originated the loan or by an independent servicer. The two largest investors in the secondary mortgage market are the Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). In this case, Huntington originated and serviced the Appellees' loans, but the loans were owned by Fannie Mae.

2. "The loan-to-value ratio is a result of the equity investment that a borrower makes in a home; the lower the equity investment a borrower makes, the higher the loan-to-value ration will be." Amicus brief, p. 4. For example, when the equity investment in the home is 20%, the LTV is 80%.

3. "Mortgage insurance, whether issued through a federal program (like the Federal Housing Authority) or by a private insurer, is an insurance policy issued to the lender (or its successor-in-interest) that is designed to protect against the risk of loss in the event of default if the value of the unpaid balance of the loan exceeds the value of the mortgaged property at foreclosure. Although the lender takes out the insurance, the existence of the policy enables a borrower to borrow a greater percentage of the purchase price, thereby reducing the amount of down payment required and bringing the price of home ownership within the reach of more people. Because of the 80% LTV cap that would exist without such insurance, mortgage insurance permits the lender to extend credit to high-risk borrowers who would not have otherwise qualified for it with the knowledge that such loans are eligible to be purchased by the secondary market." *Deerman v. Federal Home Loan Mortgage Corp.*, 955 F.Supp. 1393, 1396 (N.D.Ala.1997), *aff'd by* 140 F.3d 1043 (citations omitted).

*Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct.App. 1991).

### *Discussion*
#### I.

The first issue raised is whether the Appellees were contractually obligated to pay PMI premiums under the terms and conditions of their mortgage agreements with Huntington. Appellees assert that their mortgage contracts did not require them to pay "one dollar" of PMI premiums and that it was a breach of contract for Huntington to collect the premiums. Appellees' brief, p. 17. In the alternative, they argue that they are not obligated to pay PMI once they reach 20% equity. We disagree.

■ It is well settled that a mortgage agreement is a contract. *Cobbum v. Ameritrust Nat'l Bank, Michiana,* 580 N.E.2d 969, 971 (Ind.Ct.App.1991). As such, the individual parties have a right to define their mutual rights and obligations. *Id.* It is not within the province of this court to make a new contract for the parties or to ignore or eliminate any provisions in the instrument. *Id.* "The meaning of the agreement is to be ascertained by an examination of the entire contract. Particular words or paragraphs cannot be isolated from the remainder of the agreement. It must be read as a whole." *In re Buntin,* 496 N.E.2d 1351, 1353 (Ind.Ct. App.1986), *reh'g denied, trans. denied.* "It is commonly accepted that 'where other instruments are executed contemporaneously with a mortgage and are part of the same transaction, a mortgage may be modified by other instruments and all the documents are to be read together to determine and give effect to the intention of the parties.'" *Merchants Nat'l Bank & Trust Co. of Indianapolis v. H.L.C. Enterprises, Inc.,* 441 N.E.2d 509, 512–513 (Ind.Ct.App.1982) (*quoting Boyette v. Carden,* 347 So.2d 759, 761 (Fla.Dist.Ct. App.1977)). The language of the mortgage and supporting instruments, unless it is ambiguous, represents the intention of the parties and is controlling. *Id.* at 513.

■ Here, the mortgage agreements entered into by both Debrota and Dudley contained the following provisions relating to the payment of PMI premiums:

"2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower *shall pay* to Lender on the day monthly payments are due under the Note, *until the Note is paid in full,* a sum ("Funds") for: ... (e) yearly mortgage insurance premiums, *if any;* and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payments of mortgage insurance premiums.

\* \* \* \* \*

8. Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Investment, Borrower shall pay the premiums required to maintain mortgage insurance in effect.... Borrower shall pay the premiums required to maintain mortgage insurance in effect ... until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law."

Record, pp. 123–125, 130–132 (emphasis added).

We first examine the language of paragraph eight of the agreement. This paragraph clearly states that if PMI was a condition of making the loan the borrower "shall pay the premiums." *Id.* The Mortgage Commitment Letter setting forth the terms and conditions of Huntington's commitment to the Appellees stated the following:

"THIS COMMITMENT IS CONTINGENT UPON THE CONDITIONS AS NUMBERED BELOW:

\* \* \* \* \*

(4) Receipt of the mortgage insurance approval by coverage at 22%, AT TIME OF CLOSING."

Record, pp. 137, 142. Because PMI was a condition of the loan commitment, the plain language of paragraph eight makes payment of PMI premiums a term of the agreement.

Appellees, however, take contention with the phrase "until the requirement for mortgage insurance ends in accordance with any

# Page 165

written agreement between Borrower and Lender...." Record, pp. 125, 132. They assert that this phrase required Huntington to enter into a separate written agreement requiring the payment of PMI premiums. We find this to be a strained interpretation of the language. The most obvious meaning of the phrase is that a written agreement is required to *terminate* the obligation to pay PMI already established by the preceding language. The phrase plainly states that the premiums must be paid until the "requirement ... ends" by any written agreement. *Id.* Therefore, we conclude that the language of paragraph eight of the mortgage agreement plainly establishes an obligation to pay PMI premiums and, we find *no reason to* construe it otherwise.

Our interpretation of the mortgage agreement, however, does not stop with paragraph eight. We must look at the agreement as a whole to fully establish the complete agreement with respect to PMI premiums. *See Buntin,* 496 N.E.2d at 1353. Although paragraph eight establishes the requirement of PMI payment, paragraph two specifies when and for how long such premiums must be paid. The language of this paragraph plainly requires the premiums to be paid "until the Note is paid in full." Record, pp. 123, 130.

Therefore, reading the relevant provisions of the mortgage agreement as a whole, we conclude that the agreement required the Appellees to pay PMI premiums for the life of the loan unless there was a written agreement between Huntington and the Appellees that stated otherwise.[4] The Appellees do not suggest, nor do we find, that there was any other written agreement relating to PMI.

Furthermore, the designated evidence demonstrates that the Appellees clearly understood that they would have to pay PMI premiums because they were not making down payments of at least 20%.[5] In addition, the loan documents provided to the Appellees set forth the PMI premiums required on their respective loans. This evidence affirmatively establishes that the Appellees intended to be bound by the contract term for the payment of PMI.

In determining the Appellees' rights with respect to PMI premiums, we have examined the express contract made between them. Nevertheless, the Appellees argue that they have a right to cancel the payment of PMI premiums upon reaching an 80% LTV. We find nothing in the mortgage agreement and supporting documents that gives rise to such a right. Although Fannie

---

4. Other courts, examining mortgage contracts with similar or identical language to the ones here, have also held that the mortgage agreements required the mortgagor to pay PMI premiums for the full life of the loan. *See Deerman,* 955 F.Supp. at 1397; *Hinton v. Federal Nat'l Mortgage Ass'n,* 945 F.Supp. 1052, 1056, 1059 (S.D.Texas 1996), *aff'd by* 137 F.3d 1350; *May v. Old Kent Bank & Trust Co.,* No. 95–2697–CK, slip op. at 2 (Mich.Cir.Ct. July 15, 1996); *Blair,* No. 96–2497,1997 WL 250040 at *7 (E.D.La. May 8, 1997).

5. Mr. Debrota testified as follows:

"My understanding from the time was that if I paid private mortgage insurance or PMI, then I would not have to put down 20 percent, and that if I took that route, then—my credit situation otherwise was very good and that really the only reason I couldn't get a house other than by using the PMI route was because of this traditional requirement of 20 percent down, so my understanding was is that if I went through Huntington, I believe—I believe at the time I was aware of Huntington Bank, but if I did deal with PMI and put down 5 percent, I'd be able to get the loan with really

no problem. That was my understanding at the time.

*  *  *  *  *  *

I knew that to get a loan putting less than 20 percent down I was going to have to pay PMI....

*  *  *  *  *  *

It was a requirement imposed by, in this case it was Huntington Mortgage Company on me in order to get the loan."

Record, pp. 146, 158–159.

Mr. Dudley testified as follows:

"Q What was your understanding of private mortgage insurance at the time you purchased the Hillside Avenue property?

A (Dudley) That I had to have it. Beyond that nothing.

Q And you had to have it, I take it, because you did not have sufficient capital to put down more than 20 percent for the purchase of this property?

A Correct.

*  *  *  *  *  *

A I knew that private mortgage insurance was a requirement of me qualifying for the mortgage."

Record, pp. 197, 202, 212.

Mae's servicing guidelines do authorize servicers to waive PMI insurance once a borrower reaches 80% LTV, such a policy creates no right in the borrower to unilaterally discontinue payment of premiums agreed to in their mortgage agreements. *See Hinton,* 945 F.Supp. at 1057; *see also Deerman,* 955 F.Supp. at 1397 (holding that the mortgage agreement does not provide a specific right to cancel PMI). Fannie Mae's servicing guidelines are not part of the mortgage agreement. *Hinton,* 945 F.Supp. at 1057. "The [servicing] guide is a set of instructions from a lender-principal to a servicer-agent; it is not a contract between borrower and lender." *Id.* Therefore, we conclude that the Appellees have no contractual right to a cancellation of their PMI payments at any time during the life of their loans.

Notwithstanding this contractual obligation, Appellees argue that there is no need to collect PMI premiums from the borrower once the borrower reached 20% equity and, as such, it is improper for the lender to collect the premiums after this point. However, Appellees cite no law prohibiting the collection of PMI for the entire period of the loan. *See Wardrop v. Comerica Mortgage Corp.,* 95–1532–CK, slip op. at 6 (Mich. Cir Ct. February 14, 1997) (holding that there was no prohibition against requiring that a mortgagor maintain PMI for the full life of a loan); *see also May,* No. 95–2697–CK, slip op. at 2. Furthermore, parties have a right to freely define their mutual rights and obligations and we will not rewrite the terms of their agreements. *See Cobbum,* 580 N.E.2d at 971.

Although the Appellees assert that PMI premiums are unnecessary and constitute over-insurance once a borrower has reached 80% LTV, they ignore the fact that PMI insurance may indeed be necessary for those borrowers still in a high default risk category. Many lenders and servicers, including Huntington, have criteria which must be met before they will allow a borrower to forego payment of PMI premiums, including a reappraisal of the mortgaged property to determine if the property has depreciated since the original appraisal. Thus, the Appellees have failed to convince us that the requirement of PMI premiums over the full life of the loan is either unlawful or so unnecessary as to prevent parties from contracting for such a term.

> "[I]f the bank, in lending money, wants to require [PMI] insurance, even for the life of the loan, and the borrower agrees, this Court has no business changing the terms. Plaintiff could have shopped for other lenders, could have attempted to negotiate other terms more favorable, etc. She did not."

*May,* No. 95–2697–CK, slip op. at 3.

In conclusion, we hold that the mortgage contract clearly required the Appellees to pay PMI premiums and that there is no issue of material fact as to whether Huntington was authorized to collect such payments. *See Rosi,* 615 N.E.2d at 434. Consequently, Huntington is entitled to summary judgment as a matter of law on the breach of contract claim. *See id.*

Because we conclude that Huntington was authorized by the mortgage agreement to collect PMI premiums for the full life of the loan, we find it unnecessary to address Appellees' claims for conversion and unjust enrichment with respect to Huntington's collection of those premiums. Therefore, we hold that Huntington is also entitled to summary judgment on these two claims. *See Blair,* 1997 WL 250040 at *11–12 (holding that where mortgagor agreed to pay PMI premiums for the life of the loan there are no claims for conversion or unjust enrichment).

## II.

The second issue raised is whether the relationship between the Appellees and Huntington was one that required Huntington to make certain disclosures to Appellees regarding PMI. Specifically, Appellees assert that Huntington had a duty to disclose the following: 1) that there was no written agreement or applicable law which required them to pay PMI;[6] 2) the true nature purpose and requirements of PMI; 3) the fact

---

**6.** Because we have already determined that the mortgage agreement required Appellees to pay PMI, we do not consider this item in our analysis.

that they could obtain PMI from the insurer of their choice; 4) the point at which they were no longer required to pay PMI, if at all;[7] 5) the criteria for discontinuing payment of PMI premiums; 6) that Huntington financially benefitted from the wrongful payment of PMI premiums; and 7) the premiums for PMI did not decrease as Appellees paid down the principal of the loan. Record, pp. 23–24. Appellees contend that the duty to disclose this information arises from a fiduciary relationship that exists between Huntington and Appellees. This alleged failure to disclose is the basis of Appellees' claims for breach of fiduciary duty and fraud. They also assert that Huntington's failure to disclose supports claims for civil conspiracy and breach of a bailment contract. We will consider each of these contentions in turn.

### A. Breach of Fiduciary Duty and Fraud

The general rule in Indiana is that "the mere existence of a relationship between parties of bank and customer or depositor does not create a special relationship of trust and confidence." *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 879 (Ind.Ct.App. 1983); *see also Nicoll v. Community State Bank*, 529 N.E.2d 386, 389 (Ind.Ct.App.1988), *reh'g denied, trans. denied; Mantooth v. Federal Land Bank of Louisville*, 528 N.E.2d 1132, 1138–1139 (Ind.Ct.App.1988), *reh'g denied, trans. denied*. Mortgages do not transform a traditional debtor-creditor relationship into a fiduciary relationship absent an intent by the parties to do so. *Judd v. First Federal Sav. and Loan Ass'n*, 710 F.2d 1237, 1241 (7th Cir.1983). A lender does not owe a fiduciary duty to a borrower absent some special circumstances. *Block v. Lake Mortgage Co.*, 601 N.E.2d 449, 452 (Ind.Ct.App.1992), *reh'g denied; see also Mantooth*, 528 N.E.2d at 1138–1139.

> "Although the existence of a confidential relationship depends upon the facts of each case, it can be generally stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in

the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage."

*Peoples*, 443 N.E.2d at 879 (quoting *Hunter v. Hunter*, 152 Ind.App. 365, 372, 283 N.E.2d 775, 779 (1972)) (citations omitted).

Here, the allegations in the Appellees' complaint do not set forth such special circumstances. They assert that Huntington's superior knowledge and expertise, its control over the funds paid by the Appellees for PMI, its control over the purchase of the PMI insurance, its duty to provide an annual accounting and its duty to verify escrow items all give rise to a fiduciary duty to disclose to the Appellees the process for canceling PMI insurance at 80% LTV. We disagree.

First, the circumstances described by the Appellees would generally be part of almost any borrower and lender relationship. Second, Appellees' contention that Huntington "at the very least *must* tell homeowners of their unfettered right to cancel the worthless mortgage insurance" is grounded in the idea that Appellees had a right to cancel PMI. Appellees' brief, p. 24 (original emphasis). However, we have already determined that no such right exists under the contract. We cannot logically conclude that Huntington had a duty to disclose to the Appellees a right which they did not possess. *See Hinton*, 945 F.Supp. at 1059 (holding that injury could not be established for the purposes of a consumer protection action where Fannie Mae did not inform the borrower of a right to cancel PMI where such right did not exist).

In *Blair*, the district court noted that a lender, "as an escrow agent for insurance premiums, taxes, and other such funds, has certain fiduciary duties to properly safeguard, disburse, and account for such monies." *Blair*, 1997 WL 250040 at *11. How-

---

7. We have also previously determined that the mortgage agreement required Appellees to pay PMI premiums for the full life of the loan. Therefore, we also decline to consider this item.

ever, such fiduciary duties do not encompass "a duty to secure the lowest insurance rate, the best terms, the strongest company, etc. any more than the collection and disbursement of escrow funds for taxes would create a fiduciary responsibility to argue for lower assessments." *May*, No. 95–2697–CK, slip op. at 3. Huntington's duty under the mortgage agreement was to receive the payments from the Appellees and to use the funds to pay the PMI premiums. Appellees do not assert that Huntington failed to perform this obligation.

■ In sum, the Appellees have not designated evidence of special circumstances that would make their relationship with Huntington more than that of debtor-creditor. Nor have they demonstrated that the mortgage contract was anything more than an arm's length business transaction. Therefore, we hold that there is no issue of material fact that Huntington's had a fiduciary duty to disclose information about PMI insurance. Consequently, Huntington is entitled to summary judgment as a matter of law on the claim for breach of fiduciary duty. Because a duty to disclose is a prerequisite for a claim of fraudulent concealment, we also hold that Huntington is entitled to summary judgment on the claim for fraud. *Bob Nicholson Appliance v. Maytag Co.*, 883 F.Supp. 321, 327 (S.D.Ind.1994) (applying Indiana law).

### B. Civil Conspiracy

■ Appellees allege in their amended complaint that Huntington and A.H.M. Graves Co., Inc., a real estate agency, engaged in a conspiracy by suppressing facts regarding PMI. Record, p. 16. Although there is no cause of action for conspiracy in Indiana, there is a cause of action for damages resulting from conspiracy. *Indianapolis Horse Patrol, Inc. v. Ward*, 247 Ind. 519, 522, 217 N.E.2d 626, 628 (1966); *see also Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600 (Ind.Ct.App.1993), *aff'd by* 638 N.E.2d 1228 (Ind.1994). Civil conspiracy is defined as a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful

means. *Horse Patrol*, 247 Ind. at 522, 217 N.E.2d at 628.

■ We have already determined that Huntington was authorized by the mortgage contract to collect the PMI premiums and that it had no duty to disclose information about cancellation of PMI to the Appellees. Consequently, we find no unlawful act or even some purpose accomplished by unlawful means which would sustain a claim of civil conspiracy. *See id.* Therefore, we hold that Huntington is entitled to summary judgment on the conspiracy claim.

### C. Bailment

■ Finally, Appellees allege in their amended complaint that a bailment was created between Appellees and Huntington when Huntington placed insurance premiums in escrow funds thereby giving rise to a duty to disclose certain facts to the Appellees. Record, p. 30–32. In Indiana, a bailment is created when a bailee is entrusted with personal property of the bailor for a specific purpose. *Iemma v. Adventure RV Rentals*, 632 N.E.2d 1178, 1181 (Ind.Ct.App.1994); *Turner v. Clary*, 606 N.E.2d 878, 880 (Ind.Ct. App.1993). When the purpose is accomplished, the property is returned to the bailor. *Id.* When a bailment occurs, there is no transfer of ownership. *Id.* The bailee acquires only a possessory interest in the property during the bailment. *Turner*, 606 N.E.2d at 880. In bailment, the identical thing is returned, compared with a loan or sale where a thing of equal value may be returned. *Zurich General Accident & Liability Ins., Co. Ltd. of Zurich, Switzerland v. Safe–T–Kros Drug Co.*, 91 Ind.App. 130, 133, 170 N.E. 351, 352 (1930).

■ Appellees' argument fails under the definition of a bailment. When an agreement between parties does not require the return of the particular item deposited with the other party, then there is no bailment. *Id.* Although Huntington had obligations under the contract to receive the payments from the Appellees and to use the funds to pay the PMI premiums, the agreement did not provide for return of the payments to the Appellees except where the amount paid exceeded amounts permitted by law or when

the loan is paid in full. We find no provision in the agreement providing for return of the funds to the borrower on demand. In fact, the agreement provides that "[t]he funds are pledged as additional security for all sums secured by this security agreement." Record, pp. 123, 130. In sum, because the mortgage agreement obligated the Appellees to pay PMI insurance premiums for the life of the loan, they did not retain "ownership" in the amounts paid such that a bailment was created. *See Iemma*, 632 N.E.2d at 1181. Because we conclude that there is no genuine issue of material fact as to the existence of a bailment, Huntington is entitled to summary judgment on this claim.

### Conclusion

In conclusion, we hold that there is no issue of material fact as to whether Huntington was authorized to collect PMI payments from the Appellees under the mortgage contract. We further find that the designated evidence does not contain facts that would support a determination that there was any relationship between Huntington and the Appellees that would impose on Huntington a duty to disclose information about cancellation of PMI. Therefore, we hold that Huntington is entitled to summary judgment on each of the Appellees' claims and we reverse the trial court's denial of Huntington's motion for summary judgment.

For the foregoing reasons, we reverse the trial court's judgment and direct the trial court to enter summary judgment for Huntington.

Reversed.

DARDEN and BAILEY, JJ., concur.