# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 04 2017, 8:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Steven S. Hoar
Michael E. DiRienzo
Evansville, Indiana

ATTORNEYS FOR APPELLEES

John D. Waller
Matthew B. Millis
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ERC I, LLC,<br>*Appellant-Defendant,*<br><br>v.<br><br>Whiteacre Funding, LLC,<br>Riverdale Funding, LLC,<br>Woodbridge Mortgage<br>Investment Fund 2 LLC,<br>*Appellees-Plaintiffs* | May 4, 2017<br><br>Court of Appeals Case No.<br>82A05-1606-MF-1316<br><br>Appeal from the Vanderburgh<br>Superior Court<br><br>The Honorable Mary Margaret<br>Lloyd, Judge<br><br>Trial Court Cause No.<br>82D03-1404-MF-1437 |

**Altice, Judge.**

## Case Summary

[1] This case involves a mortgage foreclosure of commercial real estate owned by ERC I, LLC (ERC) in downtown Evansville. Whiteacre Funding, LLC (Whiteacre) is the current holder of a note secured by a mortgage on the property. ERC has been in default for several years and owed over $3 million on the note at the time of trial. During a four-day bench trial, ERC challenged Whiteacre's right to foreclose by claiming that actions taken by Whiteacre's affiliated companies – Woodbridge Mortgage Investment Fund II, LLC (Woodbridge) and Riverdale Funding, LLC (Riverdale) – constituted fraud and bad faith. In addition to asserting affirmative defenses such as equitable estoppel, constructive fraud, and unclean hands, ERC filed several related counter and third-party claims against Whiteacre, Woodbridge, and Riverdale (collectively referred to as the Woodbridge Parties).

[2] In a sixty-four-page order containing detailed findings and conclusions, the trial court ruled in favor of the Woodbridge Parties and against ERC on all claims and defenses. On appeal, ERC challenges only the trial court's rejection of its affirmative defenses and, thus, abandons all independent claims filed against the Woodbridge Parties.

**Facts & Procedural History[1]**

_____

[1] In its order, the trial court made 149 findings of fact. ERC challenges none of these findings on appeal. Accordingly, we rely heavily on these findings in our recitation of the facts.

[3] Since 1999, ERC has owned the Woolen Mill Building (the Property) in downtown Evansville. Alan Brill, a sophisticated businessman with years of commercial real estate experience, controls ERC. In 2007, ERC executed a promissory note (the Note) in the principal amount of $1.6 million payable to GreenPoint Mortgage Funding, Inc. The Note was secured by a first mortgage against the Property (the Mortgage). The Note and Mortgage were assigned a number of times, with Waterfall Victoria Mortgage Trust 2011-SBC1 (Waterfall) holding the note as of March 21, 2011. ERC has been in default since 2010.

[4] As of June 24, 2011, ERC owed an accelerated balance under the Note of over $2.1 million. To stave off foreclosure, ERC entered into a forbearance agreement with Waterfall. The agreement provided that Waterfall would not foreclose provided that ERC made monthly payments of $5500 and bought out Waterfall by July 15, 2012, in the discounted amount of $950,000. ERC defaulted under this agreement.

[5] ERC's primary contact with Waterfall was Joe Temm, an agent for Waterfall who serviced the Mortgage. After ERC defaulted under the initial forbearance agreement, Temm actively pursued Brill for updates regarding ERC's efforts to obtain financing. Temm became increasingly frustrated with Brill's inability to come through on his promises to obtain funding.

[6] On July 11, 2013, Temm advised Brill that Waterfall would sell the Note to another investor in the next thirty to sixty days. Thereafter, Brill informed

Temm that ERC had a negative cash flow and that he had been subsidizing the Property to keep it open.  Brill indicated that ERC could offer no more than $700,000 to pay off Waterfall, which would be obtained from a hard-money lender in August.  Ultimately, Waterfall agreed to accept a discounted price of $750,000 if the note sale closed by September 25, 2013.  When Brill failed to obtain financing by that date, Temm exerted significant pressure on Brill[2] through multiple communications and demanded a non-refundable deposit to keep the discounted deal alive.  ERC made a $10,000 payment to Waterfall on October 21, 2013.

[7]     During this time, Brill urgently explored financing from several private lenders because conventional financing was not an option under the circumstances.  On October 15, 2013, a lender issued a non-binding letter of intent but then backed out two days later because the lender determined "the assets [were] not nearly strong enough to support the deal".  *Exhibits Vol. 8*, Exhibit 44.

[8]     Brill also sought a loan from Green Lake Fund (Green Lake) and assured Temm, on October 18, 2013, that he was close to having a term sheet from Green Lake.  When Brill had nothing by the end of October, Temm sent the following email to Brill:

> Alan, have you received a term sheet yet?  We are getting
> nervous about this deal.  I know you are frustrated but we are

---

[2] In an email on October 16, 2013, Temm warned, "the investor is ready to nix the deal and go with another party as to the note sale." *Exhibits Vol. 8*, Exhibit 45.

about out of time. Please send me an update on Friday. You
might need another alternative and quickly.

*Exhibits Vol. 8*, Exhibit 47. This email was followed by another from Temm on
November 3:

What is the status[?] Please forward a copy of the term sheet etc.
This deal is on life support and the plug getting close to being
pulled.

*Exhibits Vol. 8*, Exhibit 48.

[9]     By mid to late January 2014, Brill's efforts to work out financing with Green
Lake were in a downward spiral. Accordingly, Brill searched the internet for
other asset-based lenders and found Riverdale. Riverdale is a hard-money,
asset-based lender that originates commercial loans secured by first priority
mortgage liens on real property. Woodbridge funds these loans and takes the
mortgage interest in the subject collateral.[3] Each loan request is separately
considered and approved by Robert Shapiro, the president of both companies.
Woodbridge's investor documents impose a 65% maximum loan-to-value ratio
on the loans in the fund. Woodbridge is not in the business of owning real
estate and, in the event of default by a borrower, Woodbridge seeks to quickly
liquidate the collateral to avoid carrying costs, repairs, and other expenses.

---

[3] Given the symbiotic relationship between Riverdale and Woodbridge, they are often referred to
interchangeably in the trial court's order and this decision.

[10] Brill called Riverdale on January 20, 2014, and spoke with Tony Coffman, who forwarded a summary form (much like a loan application) for Brill to complete on behalf of ERC. Brill emailed the completed form back to Coffman that same day. In the form, Brill represented that the Property had appraised for $3.4 and $3.8 million in 2006 and 2007 and that it had a current estimated value of $2 million. Brill also provided a balance sheet for ERC that showed a gross asset value for the Property at over $3.5 million and a net value of nearly $2 million. Brill directed Riverdale to ERC's website for interior and exterior photographs of the Property. The photographs, however, were not current and did not depict the existing occupancy level or show significant water damage that had occurred. In sum, Brill oversold the value and condition of the Property in the summary form he submitted to Riverdale.

[11] Brill requested a loan in the amount of $750,000 plus costs and an additional $150,000 for needed repairs and $100,000 for a separate note payoff. He advised Riverdale from the beginning that his financing needs were urgent and that the discounted payoff offered by Waterfall was soon to expire.

[12] Coffman forwarded the completed summary form to his superior, Joe Hughis. Upon reviewing the form and the photographs on ERC's website, Hughis spoke with Brill over the phone regarding the loan request. Brill emphasized that the parties needed to move quickly before Waterfall decided to foreclose or withdraw the discounted payoff offer. Hughis forwarded the loan information and request to Shapiro and, on January 23, Shapiro approved a $900,000 loan

conditioned on the property having an appraised value of at least $1.5 million, which was a loan-to-value ratio of 60%.

[13] That same day, Coffman emailed Brill a letter advising that ERC had been conditionally approved for a $900,000 loan, with 12% interest, 1 year term, 6 points to lender, 1 point upon signing of commitment, and the remaining 5 points due at closing (the Conditional Approval). The Conditional Approval made clear that an appraisal certified to Riverdale would be required showing a value of at least $1.5 million, as well as a local real-estate broker's opinion (BPO) regarding value. ERC paid a $500 commitment fee the following day and once again expressed urgency, noting that Waterfall was losing patience.

[14] To avoid certain tax consequences, Brill requested that the loan be structured differently than Woodbridge's typical loan. Instead of Woodbridge satisfying the Note and Mortgage at the discounted price and then issuing ERC a new note and mortgage, Woodbridge agreed to obtain an assignment of the Note and Mortgage from Waterfall at the discounted price.[4] ERC would then be given a year to pay off the loan from Woodbridge and if able to do so, Woodbridge would assign the Note and Mortgage to ERC or its designee.

[15] On January 30, 2014, Hughis forwarded a loan commitment letter (the Loan Commitment) to Brill setting out the precise terms and conditions of the loan.

---

[4] Woodbridge is not in the business of buying distressed loans and only agreed to this deal structure as an accommodation to Brill.

Consistent with the Conditional Approval, the Loan Commitment expressly conditioned the funding obligation on, among other things, the receipt of an appraisal indicating that the Property has a value of "not less than $1,500,000." *Exhibit Vol. 8*, Exhibit 73. As an additional condition, the Loan Commitment required receipt of a BPO "satisfactory to [Lender] in its sole discretion." *Id.* Brill made several handwritten changes to the Loan Commitment but did not alter these conditions. The Loan Commitment was executed as amended.

[16] Brill did not inform Temm until January 28 that he was working with yet another lender. Temm responded in an email on January 30:

> Alan, the time is now. We have to get this matter resolved now or everyone will lose. I have taken a beating from my investor for not foreclosing on you months ago. If the deal with Green Lake doesn't happen we will initiate foreclosure proceedings and not look back. Sorry I have to be like this but I have no choice…. Please update me on the status of the Green Lake matter so I can let my investor know. Sorry we are out of time. Joe

*Exhibits Vol. 8*, Exhibit 72. Brill responded, copying Hughis and Coffman and including Temm's email, by informing Temm that he felt comfortable with Riverdale and was returning the signed Loan Commitment. Brill assured Temm that Riverdale "can get it done next week". *Id.* Temm, however, continued to express his frustration about Brill's lack of performance.

[17] Brill made sure that Riverdale and Woodbridge understood the urgency of the situation through phone calls and emails. Meanwhile, he pleaded with Temm for more time. In a February 2 email, Brill forwarded the Loan Commitment to

Temm and indicated: "**They want to close this week.**" *Exhibits Vol. 9*, Exhibit 79A (emphasis in original).

[18] Following execution of the Loan Commitment but before Riverdale's due diligence[5] had been completed, Brill persuaded Riverdale and Woodbridge to quickly move forward with the acquisition of the Note and Mortgage from Waterfall (the Note Sale). In a February 3 email, Brill warned that Temm was "under tremendous pressure (immediate) from his boss to quit dealing with me and go to alternative." *Exhibits Vol. 9*, Exhibit 79B (emphasis in original). Brill followed up a few hours later with an email to Woodbridge's attorney, Robert Reed, indicating that he had just received "a 'pained' call from Joe Temm." *Exhibits Vol. 9*, Exhibit 81. Brill explained: "He is still willing to sell the note but is fed up with being required to negotiate a big agreement like he was doing with [Green Lake]. Essentially he was saying 'send me money and take the note'." *Id*. Brill urged the use of "a very simple conveyance agreement" to appease Temm and get the job done. *Id*.

[19] On February 4, Brill directed Temm and Reed to work directly with each other regarding the Note Sale. He stated his intention to stay out of this part of the transaction and explained to Temm:

> The plan is simply for Woodbridge to buy the note from your holder without dealing with me in that process. You do not need

---

[5] Once Riverdale received ERC's additional commitment fee on February 3, Hughis began conducting the due diligence inquiry on behalf of Riverdale.

to deal with me in this or how I am involved. Separately Riverdale deals with me but you are out of that….Please deal with [Reed] to get the sale done to Woodbridge, and it is all behind you. Clearer and Best I not be involved. I just confuse for all.

*Exhibits Vol. 9*, Exhibit 86.

[20] Also on February 4, Brill formally ended his dealings with Green Lake. He noted that the deal had dragged on since October and become too cumbersome and complex. Brill acknowledged on February 5, however, that he was "sort of sticking [his] neck out into the uncertainty of the other option, not yet done". *Exhibits Vol. 9*, Exhibit 88. Indeed, the Woodbridge loan was not final because Riverdale had yet to receive an appraisal or BPO per the terms of the Loan Commitment.

[21] Meanwhile, just as Brill requested, Temm worked with Reed to finalize documents for the Note Sale. On February 7, Temm emailed Brill advising that the parties were close to closing the Note Sale. Per Temm's instructions, Brill executed a document entitled "Consent to Assignment" (the Consent) and returned it to Temm on February 10. In the Consent, Brill expressly consented to the Note Sale and indicated that he had introduced Waterfall to Woodbridge for that purpose. The following day, Brill – on behalf of ERC – executed an estoppel certificate (the Estoppel Certificate) to facilitate the closing of the Note Sale, as Waterfall would not close without Brill's consent. Among other things, Brill acknowledged in the Estoppel Certificate that ERC was in default in the

amount of $2,576,733.27 as of February 10, 2014.  The Estoppel Certificate also provided:

> 24.  Borrower represents and warrants that there are no defenses to its obligations under the Note and Mortgage, whether known or unknown, and if any do exist, Borrower hereby waives such defenses as to the Seller and Buyer.
>
> 25.  Borrower represents and warrants that there are no counterclaims to its obligations under the Note and Mortgage, whether known or unknown, and if any do exist, Borrower hereby waives such counterclaims as to the Seller and Buyer.

*Exhibits Vol. 9*, Exhibit 98.

[22]  Brill knew at the time he executed the Consent and Estoppel Certificate that the loan was still contingent on Riverdale's receipt of a $1.5 million appraisal and a satisfactory BPO.  He chose to permit the Note Sale despite the contingencies related to the loan in order to avoid, among other things, the risk of Waterfall foreclosing, increasing the payoff amount, or selling the loan to another party.  As a sophisticated businessman with years of commercial real estate experience, Brill understood the implication of signing these documents and did so of his own free will.  The Note Sale closed on February 11, 2014.

[23]  Riverdale's due diligence continued following the Note Sale.  As part of its due diligence, it typically looks to local realtors to provide a BPO based upon a quick sale so that Riverdale knows what Woodbridge could actually get for the collateral in the event of foreclosure.  While a quick liquidation may result in a

lower sale price, it prevents a situation where Woodbridge is stuck incurring significant holding costs.

[24] At Brill's recommendation, Hughis contacted Joe Kiefer, a local commercial real estate broker, to obtain a BPO for the Property. Hughis informed Kiefer that Riverdale would not want to sit on the Property and that he needed to know what it would sell for if it needed to be sold quickly.

[25] On February 12, 2014, Kiefer provided his initial BPO for the Property. Kiefer opined that a realistic final sales price would be approximately $1,475,000 but that it could take up to 18 months to achieve such a sale. This BPO was not satisfactory to Riverdale because Kiefer had not provided the type of valuation sought. Accordingly, Hughis spoke with Kiefer and reiterated that Riverdale needed to know what the Property would be worth if it had to be sold quickly.

[26] Kiefer provided an updated BPO on February 18, in which he concluded that to get the $1,475,000 sales price it would likely take the full 18 months of marketing time. With regard to accelerated marketing, Kiefer stated:

> If the Owners need to sell the property and close with a 60 to 90 day period, then using an auction method might be a good approach. Working with an auctioneer and real estate brokerage company together, the property should be able to sell "AS IS" (assuming no major concerns with the building structure or environmental concerns) for $750,000 to 900,000. Note: It is this broker's opinion that this price should elevate if Indiana University chooses downtown for its medical school.

*Exhibits Vol. 10*, Exhibit 112.  The updated BPO was also not satisfactory to Riverdale, as it demonstrated that the value of the Property was significantly less than $1.5 million.

[27]  Upon receiving the updated BPO, Hughis immediately contacted Brill with concerns regarding the loan.  Brill responded that he was "a little taken back by the 'fire sale' emphasis." *Exhibits Vol. 10*, Exhibit 113.  Hughis responded:

> Alan its [sic] not a fire sale its [sic] a today sale…if we wound up with this building the realtor is saying if you hold it for 18 months or more maybe we can get you the 1.4M….but then that means I have to carry the building and put more money into it…so it [sic] today's environment he is saying 750K to 900K…at this point we have to figure out what to do looking at these numbers we dont [sic] have a loan…

*Id*.  In response, Brill continued to dispute the propriety of using what he called a fire-sale valuation.  Nonetheless, he offered to pledge additional collateral.  At no time, however, did Brill seek a reduced loan amount based on the lower valuation.

[28]  On February 19, Hughis informed Brill that Riverdale was "willing to make the loan" but given the numbers provided in the BPOs "we need to figure out how to make that happen…bring money to the table or have another asset that we can be first position on." *Exhibits Vol. 10*, Exhibit 114.  Neither Brill nor ERC had cash to help close the loan.  Further, the additional collateral Brill had to offer was not a mortgage or a lien on real estate but rather a membership

interest in a limited liability company. Riverdale was not interested in that type of collateral.

[29] On February 21, Riverdale finally received the appraisal for the Property from Integra, the appraisal company that Brill had recommended. The appraisal valued the Property at $1.34 million, which was less than the $1.5 million that the Loan Commitment required. Accordingly, that same day, Hughis emailed Brill and advised that Riverdale would not be making a loan to ERC and would be returning the 1% commitment fee. Riverdale returned the fee that day.

[30] On March 27, 2014, Woodbridge assigned the Note and Mortgage to Whiteacre, an affiliate of Woodbridge that holds distressed loans. Whiteacre filed the instant action on April 1, 2014, seeking an in rem judgment of foreclosure against the Property.

[31] At no point has ERC directly challenged its default under the Note, the outstanding debt owed, or the validity of the underlying loan documents. Instead, ERC has claimed that actions taken by Riverdale and Woodbridge prevented Whiteacre from foreclosing. In its answer, ERC raised a number of related affirmative defenses, including equitable estoppel, constructive fraud, and unclean hands. ERC also asserted counter and third-party claims against the Woodbridge Parties for constructive fraud, unjust enrichment, tortious interference with a business relationship, and conspiracy. Additionally, ERC alleged promissory estoppel against Riverdale and Woodbridge, and breach of contract against Riverdale.

[32] The four-day bench trial commenced on February 8, 2016. The parties stipulated that the total amount due and owing under the Note and Mortgage was over $3.27 million as of that date, with interest accruing at $460.85 per day until entry of judgment and thereafter at the rate of 8% per annum. Having stipulated to ERC's default, the parties tried to the bench ERC's affirmative defenses, counter claims, and third-party claims.

[33] On May 11, 2016, the trial court entered judgment in favor of the Woodbridge Parties and against ERC on all claims and defenses. In doing so, the trial court set forth detailed findings and conclusions. ERC now appeals, challenging only the trial court's rejection of the affirmative defenses of equitable estoppel, constructive fraud, and unclean hands.

## Standard of Review

[34] The trial court entered findings of fact and conclusions thereon at ERC's request. Our standard of review in this regard is well settled:

> In reviewing findings of fact and conclusions of law, we apply a two-tiered standard of review by first determining whether the evidence supports the findings and then whether the findings support the judgment. The trial court's findings and judgment will be set aside only if they are clearly erroneous. *Barton v. Barton,* 47 N.E.3d 368, 373 (Ind. Ct. App. 2015), *trans. denied; see also* Ind. Trial Rule 52(A) ("[T]he court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). Findings are clearly erroneous when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the

> wrong legal standard to properly found facts. To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made.

*Bayview Loan Servicing, LLC v. Golden Foods, Inc.*, 59 N.E.3d 1056, 1066-67 (Ind. Ct. App. 2016) (some citations omitted). Further, on review, we neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Wagner v. Spurlock*, 803 N.E.2d 1174, 1179 (Ind. Ct. App. 2004).

## Discussion & Decision

[35] ERC does not challenge any of the specific facts found by the trial court. Rather, it argues that the trial court's rejection of its affirmative defenses – equitable estoppel, constructive fraud, and unclean hands – was clearly erroneous. ERC bases all of its affirmative defenses on two allegedly undisputed facts: 1) the Woodbridge Parties remained silent when Brill informed them that the Property would likely appraise for only about $1.3 million and 2) when Riverdale initially engaged Kiefer to prepare a BPO, it did not require that the BPO reflect a price that could be obtained within ninety days. Based on these facts, ERC argues that the Woodbridge Parties breached a duty to speak regarding the anticipated appraisal and a duty to act in good faith with respect to fulfillment of the BPO contingency.

*Effect of the Estoppel Certificate*

[36] We initially observe that the trial court found that by executing the Estoppel Certificate, ERC released and waived all of its defenses asserted in the instant foreclosure action. We do not agree. As set forth above, the Estoppel Certificate executed by ERC on February 11, 2014, provided in part: "Borrower represents and warrants that there are no defenses to its obligations under the Note and Mortgage, whether known or unknown, and if any do exist, Borrower hereby waives such defenses as to the Seller and Buyer." *Exhibits Vol. 9*, Exhibit 98. Thus, the plain language of this provision bars any defenses that were in existence as of the signing of the Estoppel Certificate.

[37] The essence of ERC's defenses is that the Woodbridge Parties acted in bad faith or fraudulently by not making the loan. The loan and Note Sale, according to ERC, were inseparable components of the agreement between ERC and Riverdale/Woodbridge. The affirmative defenses raised by ERC were based – at least in part – on actions taken by the Woodbridge Parties after execution of the Estoppel Certificate. The trial court erred in determining that ERC's defenses were barred. Regardless, the trial court also concluded that ERC lost on the merits.

*Duty to Speak*

[38] One basis of ERC's defenses is its claim that the Woodbridge Parties had a duty to speak when Brill notified them on different occasions that the appraisal was

likely to come in around $1.3 million.[6] He asserts that Riverdale never indicated in any way, until after Woodbridge had taken control of the Note and Mortgage, that an appraisal of around $1.3 million would kill the loan.

[39] On the contrary, the Loan Commitment set out in plain language the requirement of an appraisal of at least $1.5 million. Brill executed this contract on behalf of ERC on January 30, 2014, without making any changes to this contingency, although he made handwritten changes to other unrelated portions of the contract. Thus, as of this date, Brill and ERC were clearly on notice that the appraisal had to reach $1.5 million.

[40] Despite being aware of the contingency, Brill rejected Hughis's offer on February 5 to engage a different appraiser and pressed Hughis to use Integra so that the appraisal could be completed quickly and inexpensively. Without referencing the $1.3 million figure, Brill wrote to Hughis: "And I know the result they came up with, … which was not as high as I thought it should be, but nonetheless is adequate for our needs and (and was for the other party.)". *Exhibits Vol. 4*, Exhibit R. Then, before the appraisal and BPO conditions were satisfied, Brill consented to the Note Sale on February 10, 2014. Brill made this

---

[6] For example, in an email to Hughis on January 27, 2014, Brill indicated that he believed a recent appraiser valued the property at $1.3 million. However, in the same email, Brill expressed strong disagreement with such a valuation and emphasized that the appraiser did not speak with him and likely "operated off of rumors about the market that are not in agreement with mine." *Exhibits Vol. 4*, Exhibit E. From the beginning of his dealings with Riverdale, Brill consistently represented that the Property was worth over $1.5 million.

decision knowing that the loan was not yet secure, and the record makes clear that the urgency to close the Note Sale so quickly came directly from Brill.

[41] The Woodbridge Parties argue that they did not owe ERC a duty to speak. *See Town of New Chicago v. City of Lake Station*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010) (for silence to form the basis for estoppel or fraud, the silent party must have a duty to speak), *trans. denied*. They assert that the Loan Commitment spoke for itself and that sophisticated parties to an arm's-length transaction generally do not owe one another a duty to speak. We agree.

[42] It is well established that a fiduciary relationship may not be predicated on an arm's-length business relationship where there is no disparity in power and influence between the parties. *See Olcott Int'l & Co., Inc. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1073 (Ind. Ct. App. 2003), *trans. denied*. Further, a lender does not owe a fiduciary duty to a borrower absent special circumstances. *See Huntington Mortg. Co. v. DeBrota*, 703 N.E.2d 160, 167 (Ind. Ct. App. 1998).

> Although the existence of a confidential relationship depends upon the facts of each case, it can generally be stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage.

*Id.* (quoting *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 879 (Ind. Ct. App. 1983)).

[43] The evidence amply supports the trial court's conclusion that such special circumstances did not exist in this case where both parties were sophisticated business entities engaged in an arm's-length transaction. Accordingly, the Woodbridge Parties had no duty to speak, and the trial court had an obligation to enforce the Loan Commitment as clearly written, requiring a $1.5 million appraisal. *See First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604-06 (Ind. 1990) (courts may not require a party acting pursuant to an unambiguous contract entered into by experienced business parties to be reasonable, fair, or show good faith; such would "place the court at the negotiation table with the parties").

[44] Additionally, we observe that Riverdale did not back out on the loan based solely on the appraisal. Riverdale also considered the initial BPO and revised BPO – both of which were found to be unacceptable. Together, the appraisal and BPOs established that the Property's value was less than $1.5 million.

*The Hamlin Doctrine*

[45] Relying upon *Hamlin v. Steward*, 622 N.E.2d 535 (Ind. Ct. App. 1993), ERC argues that the Woodbridge Parties had a duty to act in good faith with respect to fulfillment of the BPO contingency. This duty, according to ERC, was breached when Riverdale obtained a revised BPO based on a fire-sale valuation. ERC asserts that when Riverdale initially engaged Kiefer, it did not require that

the BPO reflect a price that could be obtained within ninety days. ERC claims that requirement was added in bad faith after the initial BPO.

[46] A party to a contract may not rely on the failure of a condition precedent to excuse performance where that party's action or inaction caused the condition to be unfulfilled. *Id.* at 540. Thus, where a party retains control over the condition's satisfaction, an obligation to make a reasonable and good faith effort to satisfy the condition will be implied. *Id.* at 540-541 ("we must infer good faith in the performance of the condition in order to give meaning to the intention of the parties"). *See also Ind. State Highway Comm'n v. Curtis*, 704 N.E.2d 1015, 1019 (Ind. 1998) ("The *Hamlin* doctrine prevents a party from acts of contractual sabotage or other acts in bad faith by a party that cause the failure of a condition."). "A good faith effort is defined as what a reasonable person would determine is a diligent and honest effort under the same set of facts or circumstances." *Hamlin,* 622 N.E.2d at 540.

[47] In this case, the loan was conditioned, among other things, on receipt of a BPO "satisfactory to [Lender] in its sole discretion." *Exhibit Vol. 8*, Exhibit 73. Satisfaction of this condition precedent (i.e., approval of the BPO) was thus exclusively within the control of the Woodbridge Parties, and they owed ERC a duty to consider the BPO in good faith. *See Ind. State Highway Comm'n*, 704 N.E.2d at 1019.

[48] Although the trial court incorrectly determined that the *Hamlin* doctrine did not apply, the court went on to conclude that the Woodbridge Parties did not act in

bad faith in rejecting the BPOs. This conclusion is amply supported by the trial court's findings and the record.

[49] As a hard-money, asset-based lender, Woodbridge is not in the business of owning real estate and, upon default by a borrower, will seek to quickly liquidate the collateral to avoid significant holding costs. Accordingly, as part of its due diligence, Riverdale looks to local realtors to provide a BPO based upon a quick sale so that Riverdale knows what Woodbridge could actually get for the collateral in the event of foreclosure.

[50] At Brill's recommendation, Hughis contacted Kiefer to obtain a BPO for the Property. Hughis informed Kiefer that Riverdale would not want to sit on the Property and needed a valuation based on a quick sale. He believed Kiefer understood the type of valuation being sought. In the initial BPO, however, Kiefer opined that a realistic final sales price would be approximately $1,475,000 but that it could take up to 18 months to achieve such a sale.

[51] This BPO was not satisfactory to Riverdale, and for good reason. The valuation was under the $1.5 million mark and, more importantly, it was based on carrying the Property for up to eighteen months. Hughis contacted Kiefer and reiterated that Riverdale needed to know what the Property would be worth if it had to be sold quickly, such as within 90 days. As a result, Kiefer provided an updated BPO in which he opined that a quick sale would likely result in a sales price of between $750,000 and $900,000. This updated BPO, while it accurately represented the type of valuation needed, was not

satisfactory to Riverdale because it demonstrated that the value of the Property was significantly less than $1.5 million.

[52] As recognized by our Supreme Court, causing the failure of a condition precedent "means more than the mere rejection of the contract for sound reason". *Id*. Riverdale's decision to reject the BPOs in this case was based on sound reasons and done in good faith. ERC's arguments to the contrary are improper invitations for us to reweigh the evidence, which we decline.

## Conclusion

[53] The affirmative defenses asserted by ERC all rely on the same theory that the Woodbridge Parties breached duties to speak and deal in good faith. The trial court's conclusion that no duty to speak existed under the circumstances is supported by the findings of fact and is not clearly erroneous. Further, although the *Hamlin Doctrine* applied with respect to the BPO contingency, the findings support the trial court's conclusion that the Woodbridge Parties did not act in bad faith when rejecting the BPOs. For these reasons, the trial court's rejection of the affirmative defenses was not clearly erroneous.

[54] Judgment affirmed.

[55] Riley, J. and Crone, J., concur.